# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 12-CV-1084 (JFB)(AKT)

_____

PAULA BREITKOPF, AS ADMINISTRATIX OF THE ESTATE OF GEOFFREY J. BREITKOPF, DECEASED, AND PAULA BREITKOPF, INDIVIDUALLY,

Plaintiffs,

VERSUS

METROPOLITAN TRANSPORTATION AUTHORITY POLICE OFFICER GLENN GENTILE ET AL.,

Defendants.

_____

**MEMORANDUM AND ORDER**
August 29, 2014

_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Paula Breitkopf ("plaintiff"), individually and on behalf of the estate of her deceased husband, Nassau County Police Department ("NCPD") Officer Geoffrey Breitkopf ("Breitkopf" or "decedent"), brings this action against defendants Metropolitan Transportation Authority ("MTA") Police Officer Glenn Gentile ("Gentile"); MTA Police Officer Jose Ramos ("Ramos"); the MTA and the MTA Police Department ("MTAPD") (collectively, the "MTA"); John Cafarella ("Cafarella"); the Estate of Anthony G. DiGeronimo ("Anthony" or the "Estate"); David DiGeronimo ("David") and Joanne DiGeronimo ("Joanne") (collectively, the "DiGeronimos"); and the City of New York ("NYC" or the "City"). Gentile killed Breitkopf by friendly fire on March 12, 2011, during the aftermath of an incident

that resulted in Anthony's death at his home in Massapequa Park, New York. Plaintiff brings numerous claims against defendants, including federal claims pursuant to 42 U.S.C. § 1983 for violations of Breitkopf's Fourth Amendment rights, state law negligence and intentional tort claims for personal injury and wrongful death, and state law claims for violations of New York General Municipal Law ("GML") § 205-e.

Presently before the Court are motions for summary judgment from all defendants except the Estate. (Motion for Summary Judgment by John Cafarella ("Cafarella Motion"), Docket No. 95; Motion for Summary Judgment by David D. DiGeronimo and Joanne DiGeronimo ("DiGeronimo Motion"), Docket No. 116; Motion for Summary Judgment by Glenn Gentile ("Gentile Motion"), Docket No. 119; Motion for Summary Judgment by

Metropolitan Transportation Authority, Metropolitan Transportation Authority Police Department, Jose Ramos ("MTA & Ramos Motion"), Docket No. 139; Motion for Summary Judgment by City of New York ("NYC Motion"), Docket No. 149.) For the reasons set forth in detail below, the motions for summary judgment are granted in part and denied in part with respect to Gentile, the MTA, and Cafarella, and granted in their entirety with respect to Ramos, the City, and the DiGeronimos.

In particular, with respect to the Section 1983 claim against Gentile, the Court concludes that genuine disputes of material fact preclude summary judgment on the issue of whether Gentile's failure to realize Breitkopf was a police officer and Gentile's decision to use lethal force were objectively reasonable under the Fourth Amendment. Those disputes also preclude summary judgment on the Section 1983 claim against Gentile on qualified immunity grounds. For the same reasons, the state law claims for battery and wrongful death against Gentile, as well as the state law claim against the MTA under a theory of *respondeat superior* liability, also survive summary judgment.

With respect to the Section 1983 and state law battery and wrongful death claims against Ramos, the Court concludes that no rational jury could find that Ramos's decision to grab Breitkopf, upon hearing retired New York City Police Department ("NYPD") Sergeant Cafarella yell "gun" (or "drop your weapon") as he saw Breitkopf walking past him in plainclothes and holding a rifle, was objectively unreasonable and, thus, constituted excessive force under the circumstances. In the alternative, the Court concludes that Ramos's actions would be protected by qualified immunity.

With respect to the Section 1983 claims against the MTA and the City for failure to

adequately train Gentile and Ramos, the Court concludes that such claims cannot survive summary judgment because, *inter alia*, there is insufficient evidence in the record to create a genuine issue of material fact on those claims. The Court also concludes that any negligence claim against the City cannot survive summary judgment.

With respect to the negligence and wrongful death claims against Cafarella, the Court concludes that there are disputed issues of material fact on the issue of whether Cafarella's alleged involvement in the police activity (as a retired NYPD sergeant) and his decision to yell "gun" (or words to that effect) negligently caused Breitkopf's death. Thus, summary judgment on these claims against Cafarella is unwarranted. The Court similarly concludes that the Section 205-e claim against Cafarella, based upon an alleged violation of N.Y. Penal Law § 190.25(3), survives summary judgment, because there are issues of fact as to whether Cafarella was trying to induce Breitkopf and/or other police officers to act in reliance on his pretended official or approved authority, and induced Ramos and Gentile to act on that pretended authority.

With respect to the negligence claim against the DiGeronimos, the Court concludes that any alleged act or omissions by them, including as it relates to their son's possession of knives (which precipitated the police activity), cannot form the basis of a negligence claim against them as it relates to Breitkopf's death. The DiGeronimos had no duty to prevent friendly-fire shootings among police officers at the scene after Anthony was killed, and, in any event, no rational jury could conclude, in light of the other intervening events, that the DiGeronimos' alleged negligence involving their son proximately caused Breitkopf's death. Thus, summary judgment in favor of them on the negligence claim is warranted.

Finally, the Court also concludes that, with the exception of the above-referenced claim against Cafarella, the GML § 205-e claims cannot survive summary judgment.

## I. BACKGROUND

### A. Factual Background

The Court takes the following facts from the parties' affidavits, depositions, exhibits, and Rule 56.1 Statements of Fact. The Court construes the facts with respect to each motion in the light most favorable to the nonmoving party, plaintiff. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). The parties' Rule 56.1 statements contain specific citations to the record, and the Court generally cites to the statements rather than to the underlying citations. Unless otherwise noted, where a Rule 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any contradictory evidence in the record.

#### 1. The Death of Anthony DiGeronimo

On March 12, 2011, the day Gentile shot Breitkopf, the DiGeronimos; their 21-year-old son, Anthony; and Anthony's brother, Jonathan, resided at 5 Fourth Avenue in Massapequa Park, New York. (Plaintiff's Supplementary Facts in Response to the DiGeronimos' Rule 56.1 Statement ("Pl. DiGeronimo 56.1 Suppl.") ¶ 1.) The DiGeronimos previously owned a hobby shop in Amityville, New York, where they sold radio-controlled cars, rockets, knives, and swords, among other products. (*Id.* ¶ 2.) Although Anthony had worked in the store, he was unemployed in March 2011, and his parents supported him economically. (*Id.* ¶ 3.) Anthony, an avid video gamer who would wear costumes while playing, was interested in different religions, including Satanism. (Plaintiff's Counterstatement of Facts in Response to the DiGeronimos' Rule 56.1 Statement ("Pl. DiGeronimo 56.1

Counterstatement") ¶ 4.) He maintained a collection of knives, swords, and other weapons in his bedroom, which he kept unlocked and his mother entered almost every day. (*Id.* ¶¶ 5–6.) One of the knives was an Interceptor, a knuckles blade knife that Anthony generally kept in a plastic holder. (DiGeronimo 56.1 ¶ 7; *see* MySpace Profile Screenshot, Response in Opposition to the Motion for Summary Judgment of David D. DiGeronimo and Joanne DiGeronimo ("DiGeronimo Opp.") Ex. E (showing Anthony holding the Interceptor).) Joanne testified that, prior to March 12, 2011, she never saw Anthony leave the house with any weapons, and she had no concerns about his interests. (Pl. DiGeronimo 56.1 Counterstatement ¶ 8; Pl. DiGeronimo 56.1 Suppl. ¶ 11.)

At around noon on March 12, the DiGeronimos were in their kitchen when Anthony entered the kitchen dressed in an outfit he often wore while playing video games, including a mask that covered his face from his nose down to his chin. (Pl. DiGeronimo 56.1 Suppl. ¶ 12.) David told Anthony to take the mask off; the two then had a heated exchange, and David told Anthony to leave and come back when his attitude changed. (*Id.* ¶¶ 13–14.) During his first deposition, David testified that when Anthony left the house, he was carrying a thin, black-handled, seven-inch knife. (*Id.* ¶ 16; *see also* Memorandum of Interview with David DiGeronimo ("DiGeronimo Interview"), DiGeronimo Opp. Ex. D (corroborating first deposition testimony during interview on June 10, 2011).) During a later deposition, David recanted and stated: "When [Anthony] was in the kitchen before he left, I didn't see knives at that point. When he came back to the house is when I saw the knives on him, but before he left, I didn't see it." (Second Deposition of David DiGeronimo ("Second D. DiGeronimo Dep.") at 6:4–19, DiGeronimo

Opp. Ex. F.) The DiGeronimos did not see Anthony again until that evening.

At approximately 8:10 p.m., NCPD Officer Paul Lewis ("Lewis") responded to the intersection of Front Street and Fourth Avenue in Massapequa Park after a 911 caller reported seeing a male walking with knives.[1] (Deposition of Paul Lewis ("Lewis Dep.") at 10:3–14:12, MTA & Ramos Motion Ex. A; Nassau County District Attorney's Office: "Investigation into the Deaths of Anthony DiGeronimo and Officer Geoffrey Breitkopf" ("DA Report"), MTA & Ramos Motion Ex. Y; *see also* Pl. DiGeronimo 56.1 Suppl. ¶ 18.) Lewis encountered Anthony, who was wearing a mask and clothing Lewis described as "satanic in nature," and carrying a knife in each hand. (Lewis Dep. at 15:21–16:19; Pl. DiGeronimo 56.1 Suppl. ¶ 21.) Lewis ordered Anthony to drop the knives, and, in response, Anthony charged Lewis. (Lewis Dep. at 19:12–21:7.) Cafarella, a retired NYPD sergeant, also was present. He urged Anthony to comply with Lewis's orders. (Lewis Dep. at 28:14–20; Deposition of John Cafarella ("Cafarella Dep.") at 11:4–18**,** 34:0–35:22, 38:11–24, MTA & Ramos

Motion Ex. B; *see also* Cafarella 56.1 ¶ 1.) Anthony, ignoring Lewis's commands, eventually stopped charging, turned back, and started walking towards his home. (Lewis Dep. at 23:10–24:6.) Lewis radioed for an Emergency Services Unit, and Cafarella called 911 to request assistance for Lewis. (Lewis Dep. at 31:3–32:10; Cafarella Dep. at 41:8–12.) Cafarella approached the house to get the address. (Plaintiff's Supplementary Facts in Response to Cafarella's Rule 56.1 Statement ("Pl. Cafarella 56.1 Suppl.") ¶ 15.)

After Anthony reached his house and David ushered him inside, Lewis and NCPD Officer Richard McDonald entered with their guns drawn. (Pl. DiGeronimo 56.1 Suppl. ¶¶ 25–27; Lewis Dep. at 36:3–39:2.) Anthony eventually emerged from his bedroom, came towards the officers with a knife held upward, and was shot and killed. (MTA & Ramos 56.1 ¶ 3; DA Report, at 6–7.) Officers then transmitted a radio broadcast of "shots fired" and requested an ambulance. (MTA & Ramos 56.1 ¶ 4.) This was quickly followed by the broadcast of a code 1087, or "slow down" order, meaning that while officers could still respond to the scene, there was no immediate urgency to do so, or need to come as fast as before. (*See id.* ¶ 5; Plaintiff's Counterstatement of Facts in Response to the MTA's and Ramos's Rule 56.1 Statement ("Pl. MTA & Ramos 56.1 Counterstatement") ¶ 5.) NCPD officers also panned out and created a perimeter around the DiGeronimos' house. (Pl. DiGeronimo 56.1 Suppl. ¶ 39.)

After the whole incident, including Breitkopf's death, officers from the NCPD Crime Scene Unit responded and took photographs of Anthony's room. (*Id.* ¶ 46.) Shelves contained a hatchet, mallet, swords, and several large and small knifes. (*Id.*) Officers recovered a knife, leather cap, and a black and gray mask on the floor near

---

[1] During oral argument, plaintiff's counsel argued that it is disputed whether Anthony was carrying the Interceptor with him on March 12. The Court disagrees. There is no testimony or documentary evidence from which a reasonable factfinder could conclude that Anthony was carrying the Interceptor, an item obviously different from a black-handled, seven-inch knife. (*See* MySpace Profile Screenshot, DiGeronimo Opp. Ex. E (showing Anthony holding Interceptor).) Plaintiff's speculation cannot establish a genuine dispute of fact on this issue. Therefore, it is uncontroverted that the Interceptor was in Anthony's room and played no part in the incident preceding Breitkopf's death. In any event, this issue is immaterial to the claims in this case because, as discussed *infra*, no rational jury could find proximate cause between Anthony's actions (and his parents' alleged inaction) and the death of Breitkopf.

Anthony's body. (*Id.* ¶ 47.) Among the weapons recovered were two 16-inch (with 10-inch blade) knives, a wooden-handled knife, a machete with a 17.75-inch blade, a samurai sword, a Dacor knife with a 7-inch serrated blade, a Marines saber with a 29-inch blade, and the Interceptor. (*Id.* ¶ 48.)

## 2. Gentile and Ramos Respond

The night of the shootings, MTAPD Officers Gentile and Ramos were patrolling in a marked vehicle in Massapequa. (MTA & Ramos 56.1 ¶ 6.) They saw an NCPD cruiser speed by with its lights and sirens activated, heard an "agitated" broadcast over their MTA-issued NCPD radio concerning an emotionally disturbed person in the area of Front Street and Fourth Avenue in Massapequa Park, and proceeded to that location. (*Id.* ¶ 7; Pl. MTA & Ramos 56.1 Counterstatement ¶ 7.) Upon arriving, Gentile and Ramos saw NCPD vehicles and heard the "shots fired" transmission. (MTA & Ramos 56.1 ¶ 7.) They then walked towards 5 Fourth Avenue, where five or more uniformed NCPD officers were on the front lawn, to offer assistance. (*Id.* ¶ 8.) According to Gentile, he entered the house, saw officers crouched over a body, and went back outside "[t]o assist in any way I could." (Deposition of Glenn Gentile ("Gentile Dep.") at 57:13–59:23, 66:12–16, MTA & Ramos Motion Ex. H.) Ramos, who had overheard the "slow down" transmission, decided to remain on the front lawn talking to NCPD officers, and intended to leave if he was not needed.[2] (Deposition of Jose Ramos ("Ramos Dep.") at 52:17–54:4,

63:9–12, 65:2–21, 80:19–81:3, MTA & Ramos Motion Ex. G.)

After Anthony was shot, more uniformed officers arrived, and onlookers gathered in front. (*E.g.*, Ramos Dep. at 55:4–17, 69:14–16; Gentile Dep. at 60:4–8; Lewis Dep. at 68:2–22; *see also* Pl. MTA & Ramos 56.1 Counterstatement ¶ 33.) One man attempted to force his way past the NCPD officers and onto the property. (Pl. MTA & Ramos 56.1 Counterstatement ¶ 34; Plaintiff's Supplementary Facts in Response to the MTA's and Ramos's Rule 56.1 Statement ("Pl. MTA & Ramos 56.1 Suppl.") ¶ 34.) Cafarella blocked the path of a woman, Theresa Kelly ("Kelly"), who was exiting her car and proceeding toward the house while "ranting" that "he [Anthony] scratched my car." (Cafarella Dep. at 58:7–60:12.) Cafarella, who had identified himself to NCPD officers as "retired from the job" (*see* Plaintiff's Counterstatement of Facts in Response to Cafarella Rule 56.1 Statement ("Pl. Cafarella Counterstatement") ¶ 2), told Kelly that the situation could be dangerous and to move her vehicle, and he ultimately kicked the car and yelled at her, "[G]et the f*** out of here, do you want to get killed?"[3] (Cafarella Dep. at 59:24–60:12; Pl. MTA & Ramos 56.1 Counterstatement ¶ 36.) NCPD Officer David Hicks ("Hicks") testified that there were "disturbances all around." (Deposition of David Hicks ("Hicks Dep.") at 43:16–17, MTA & Ramos Motion Ex. J.)

---

[2] Plaintiff emphasizes that Gentile and Ramos were not NCPD officers, were not on MTA property, and never informed the MTA or NCPD of their presence. (*E.g.*, Response in Opposition to the Motion for Summary Judgment of the MTA and Ramos ("MTA & Ramos Opp."), Docket No. 157, at 1; Pl. MTA & Ramos 56.1 Suppl. ¶¶ 12, 18–27.)

[3] Based on Cafarella's actions, Lewis presumed he was law enforcement, and Kelly thought he was a plainclothes officer. (Pl. Cafarella Counterstatement ¶ 3.) There is no evidence that Cafarella identified himself to Ramos or Gentile before Breitkopf's death, or that either knew of Cafarella's presence and presumed he was an active duty officer.

### 3. The Shooting of Geoffrey Breitkopf

NCPD Officers Breitkopf and Hector Rentas ("Rentas") were members of NCPD's Bureau of Special Operations ("BSO"), a tactical unit that receives SWAT training. (MTA & Ramos 56.1 ¶ 10.) On March 12, a BSO lieutenant instructed Breitkopf and Rentas to respond to a call of a man with a knife at Fourth Avenue. (*Id.* ¶ 11.) Breitkopf and Rentas, both in plainclothes, drove to the location in an unmarked vehicle. (*Id.* ¶ 12.) Rentas did not recall sending a transmission that a BSO unit was responding, nor did he recall hearing a transmission conveying that information. (Deposition of Hector Rentas ("Rentas Dep.") at 56:4–12, MTA & Ramos Motion Ex. M.) En route, Breitkopf and Rentas heard the "shots fired" communication and the request for an ambulance, followed by the "slow down" order. (MTA & Ramos 56.1 ¶ 13.) They reduced their speed, but continued towards the location. (*Id.* ¶ 14.)

Breitkopf and Rentas parked on Front Street and went to the trunk to retrieve their Rock River AR15 long rifles (also known as M4 long rifles). (*Id.* ¶ 15.) According to Rentas, despite the "slow down" order, they "didn't know what kind of condition the scene was" in. (*Id.* ¶ 15.) Inside the trunk, Breitkopf and Rentas had raid jackets with an orange NCPD patch on each shoulder and the word "POLICE" emblazoned on the front and back, but they did not put them on. (*Id.* ¶¶ 16–17.) The officers also left behind mesh vests with identifying markings. (*Id.* ¶ 18.) Rentas did not believe these were necessary under the circumstances. (Rentas Dep. at 68:7–10.) He did make sure that that his police shield was displayed visibly on a chain around his neck. (MTA & Ramos 56.1 ¶ 19.) Breitkopf, meanwhile, was wearing a burgundy maroon-colored hoodie and pants. (Rentas Dep. at 64:16–20.) Rentas did not

see Breitkopf's shield when they left the car, but he "was not even looking at [Breitkopf]."[4] (*Id.* at 65:21–23.) Breitkopf, with his long rifle held in front of him on a one-point shoulder sling with the muzzle pointed downward, proceeded toward the home over twenty feet away at a "brisk" pace. (*Id.* ¶ 20; Pl. MTA & Ramos 56.1 Counterstatement ¶ 20.) Hicks saw Breitkopf cross the street and recognized him as a BSO officer, but he did not see a shield. (Hicks Dep. at 38:7–39:16, 41:18–21.) They acknowledged each other, and Hicks allowed Breitkopf to pass.[5] (*Id.* at 42:22–43:13.)

Cafarella, who had remained at the scene, was looking towards the DiGeronimos' home when, out of his peripheral vision, he saw a person— Breitkopf—carrying a rifle. (Cafarella Dep. at 71:19–72:25, 95:4–21.) The shoulder strap and large capacity magazine caught Cafarella's attention. (MTA & Ramos 56.1 ¶ 22.) Because Cafarella did not know Breitkopf, Breitkopf was in plainclothes, and Cafarella saw nothing clearly identifying the man as a police officer, Cafarella believed that Breitkopf was a civilian carrying an assault rifle.[6] (*See id.*

---

[4] Rentas remembered seeing Breitkopf's shield after the shooting—while Breitkopf was being placed on a trundle to be lifted into the ambulance. (Pl. MTA & Ramos 56.1 Counterstatement ¶ 19.)

[5] NCPD Officer James McNally ("McNally"), who knew Breitkopf, saw him approach with the rifle on a strap at a downward angle. (Deposition of James McNally ("McNally Dep.") at 54:16–56:24, MTA & Ramos Opp. Ex. J.)

[6] Plaintiff claims that Cafarella should have known that Breitkopf was a plainclothes officer because: (1) while on active duty, Cafarella had been at scenes involving plainclothes officers and has used the same M4 assault rifle; (2) Rentas and another individual saw Breitkopf's shield around his neck later that evening; and (3) "significantly," other NCPD officers recognized Breitkopf as he approached the house.

¶ 23; Cafarella Dep. at 109:9–110:13 ("I did not see any police uniform on this person or any identifying mark as a police officer. . . . I saw somebody with an assault rifle on the lawn where a crime had just been committed. . . . He didn't identify himself. He didn't have any outermost garments. I don't know if he was going to create an imminent threat, but he did not identify himself.").) According to Cafarella, Cafarella shouted, "Gun, this guy has got a gun."[7] (MTA & Ramos 56.1 ¶ 24.) He testified that Breitkopf did not move, turn, or exhibit any aggressive body movement towards him. (Cafarella Dep. at 98:7–15.) Further, after he said "gun," he saw some quick movement, instinctively turned and backed away for his own safety, and then heard "some sort of scuffle" followed by a "pop." (*Id.* at 99:19–100:17.) "[A] few seconds" elapsed from the point Cafarella said "gun" to the point he heard the gunshot. (*Id.* at 96:23–97:5.) Cafarella never saw the barrel of the gun go up, because he had looked away. (*Id.* at 100:18–23.) He also did not "hear anybody speaking, such as who are you, on the job, MOS, LEO"; that is, he heard no identification from anyone, including Breitkopf. (*Id.* at 113:8–15.)

Ramos was on the lawn facing the front of the house and talking to two NCPD officers when he "overheard what I assumed to be a Nassau County Police Officer challenge somebody" and say "drop the weapon."[8] (Ramos Dep. at 77:3–15.) Ramos

reached for his weapon but did not unlock the holster, and he turned to see "who was being challenged." (*Id.* at 82:4–83:25.) To his left, he saw a white male in a dark shirt, without "identifying marks" and carrying "a long rifle or a long weapon." (MTA & Ramos 56.1 ¶ 26.) According to Ramos, the stock of the weapon was at the man's right side, in the area of his chest and shoulder, and the man's right hand was close to the trigger. (*Id.* ¶ 27.) Ramos did not see exactly where the barrel was pointed:

> Q. Did you see the muzzle when you first saw it?
> A. I don't recall specifically getting to see where the muzzle was.
> Q. Did you have an idea knowing weapons what the direction the rifle was pointing in?
> A. Yes.
> Q. Which direction was it pointing in?
> A. It was pointing in towards his lower left quadrant.
> Q. Was it pointing towards his foot, his pelvis, his ribs, or something else?
> A. It was pointing downward. I don't know what the specific direction it was. I didn't get the time to do that.

(Ramos Dep. at 86:7–21.)

Ramos did not hear any warning other than "drop your weapon." (*Id.* at 87:23–88:2.) When he turned towards the direction of the command, he testified that he saw NCPD officers about three to four feet away "go for [the man], you know, try to interact, physically interact with him, and I grabbed him with my left hand." (*Id.* at 88:11–25.) Ramos grabbed Breitkopf's right shoulder and grasped for the rifle in an "attempt to stop [what Ramos perceived as] the threat." (MTA & Ramos 56.1 ¶ 28.) He recalled "seeing the Nassau County Officers grab

---

(*E.g.*, Pl. MTA & Ramos 56.1 Counterstatement ¶ 23.) The Court addresses this issue more fully *infra*.

[7] Although this is the phrasing Cafarella recalls using, there is conflicting testimony on the precise wording of Cafarella's statement—that is, whether he said "gun," or "drop your weapon" or a similar phrase. There is no dispute, however, that he made some statement regarding the presence of a gun or weapon.

[8] Only Ramos has testified that he heard that phrase. (*See* Pl. MTA & Ramos 56.1 Counterstatement ¶ 25.)

him at the same time, and we were attempting to subdue what I assumed was a threat." (Ramos Dep. at 104:14–17, 108:22–109:14 (testifying that when he had his hands on Breitkopf, the NCPD officers' hands were on Breitkopf, too).) Ramos gave no warning to Breitkopf. (*See* Pl. MTA & Ramos 56.1 Counterstatement ¶ 28.) He also did not know exactly where Breitkopf's gun was pointed. (*See* Ramos Dep. at 108:13–21, 112:5–9 ("It [the barrel] was in a downward position, but we were also struggling, so I don't know where the barrel was going at the particular time. . . . [Breitkopf] could have shot any particular direction.").) Ramos did not believe, however, that Breitkopf could have shot him during the "struggle." (*Id.* at 111:10–24.) Within little more than a second after he grabbed Breitkopf, Ramos heard a gunshot. (*Id.* at 104:18–105:3.)

Gentile recalled that, while he was on the front lawn facing the house, police officers and civilians were "all over." (MTA & Ramos 56.1 ¶ 30.) He stated that he saw a "look of alarm" on the faces of two NCPD officers about ten to fifteen feet to his left, and simultaneously heard someone shouting "something about a gun or a weapon." (*Id.* ¶ 31.) According to Gentile, he turned to the left and saw "a dark figure walking at a brisk pace from my left rear," two Nassau cops "perk" up, and "a uniformed arm grab the shoulder of the figure." (*Id.* ¶ 32; Gentile Dep. at 104:5–23.) He had not seen the man before. (Gentile Dep. at 110:3–4 ("My first glimpse of him was him being spun around.").) Gentile testified: "I saw the figure kind of shrug off the attempt to grab him. Then I saw the two Nassau cops go for his other side. They made contact with him and there was a brief struggle between the figure, the two Nassau cops on one side, the other uniformed arm that I saw grabbing

him on the other side. . . ."[9] (*Id.* at 105:13–19; *see id.* at 106:19–21 (recalling that NCPD officers made contact with Breitkopf).) Gentile remembers seeing the NCPD officers "make contact with" Breitkopf's body. (*Id.* at 106:19–21.) According to Gentile, "[D]uring the struggle, I saw a rifle slung across the front of [Breitkopf's] chest, and during the struggle, I saw the rifle start coming up." (Gentile Dep. at 111:22–25, 115:2–9.) About one second later, Gentile, who was about five to ten feet away, fired one fatal shot at Breitkopf. (MTA & Ramos 56.1 ¶ 35; Gentile Dep. at 110:7–9 (stating that he heard a shot go off about one second after he saw Breitkopf spin around); 118:16–18.) Gentile has no "conscious memory" of having fired the fatal shot. (Gentile Dep. at 110:10–22, 119:5–22.) There is no evidence that Gentile saw any shield on Breitkopf.[10]

[9] The involvement of NCPD officers is greatly disputed. Only Ramos and Gentile have testified that NCPD officers also grabbed Breitkopf. Others, such as Hicks, claim that they saw NCPD officers surrounding Breitkopf or falling to the ground with him (*see, e.g.*, Hicks Dep. at 48:10–49:9), but a reasonable factfinder could infer that those officers converged on Breitkopf *after* Gentile fired his weapon. Detective Carl Re ("Re") conducted the NCPD Homicide Squad's investigation of the DiGeronimo and Breitkopf shootings. (Deposition of Carl Re ("Re Dep.") at 9:6–13:15, MTA & Ramos Opp. Ex. O.) According to Re, Gentile did not mention a confrontation between the NCPD and Breitkopf. (*Id.* at 49:22–50:2, 92:10–93:10.) Re's reports also do not mention a struggle between NCPD officers and Breitkopf. (Pl. MTA & Ramos 56.1 Suppl. ¶ 93.) Re also testified that no NCPD officer indicated that an NCPD officer took "an active role in bringing down, subduing Breitkopf before the shot was fired." (Re Dep. at 106:4–13.)

[10] No one claims to have seen the shield before the shooting. (*See* MTA & Ramos 56.1 ¶ 36.) Stephen Parry ("Parry"), who rendered aid to Breitkopf, did not recall seeing a shield when Breitkopf was turned over, even after Parry cut open Breitkopf's shirt to expose his chest. (Deposition of Stephen Parry ("Parry Dep") at 50:23–51:4, 51:20–52:6.) Rentas

Gentile also did not issue any commands to Breitkopf. (*Id.* at 115:12–13.)

NCPD Officer Keith Jaklitsch ("Jaklitsch") testified that, after Anthony was shot, officers continued showing up and everything was "settled." (Deposition of Keith Jaklitsch ("Jaklitsch Dep.") at 42:13–14, 43:8–19, MTA & Ramos Motion Ex. K.) Then, while walking along the curb in front of the house, Jaklitsch heard someone say "gun," and he turned back towards the house. (*Id.* at 47:24–48:8.) It was dark out, but Jaklitsch saw Breitkopf in front of him, and there was one officer to Breitkopf's right and another "kind of off to his left."[11] (*Id.* at 105:17–21, 48:10–13.) Jaklitsch did not see any other officers within arm's distance of the three individuals. (*Id.* at 49:2–6.) Then, immediately upon turning, he saw the officer on the right shoot Breitkopf. (*Id.* at 49:11–19.)

Immediately before the gunshot, NCPD Officer Robert Kiesel ("Kiesel") heard a "commotion" that "sounded like someone was trying to get past where the officers were on the lawn and they were trying to stop that person from coming through." (Deposition of Robert Kiesel ("Kiesel Dep.") at 36:20–37:14, MTA & Ramos Motion Ex. N.) Kiesel thought he heard someone say "stop" and "gun" or "he has got a gun." (*Id.* at 54:4–16.) Hicks testified that, after hearing "gun," he turned around, saw the downward barrel pointing near Breitkopf's leg, and then kept looking to see what was going on. (Hicks Dep. at 44:4–46:4.) After hearing the gunshot, Hicks saw two or three officers go down to the ground with Breitkopf. (Hicks Dep. at 48:12–24.) Rentas testified that, after the gunshot, the officers were "trying to take control of [Breitkopf]," and "[t]hey brought him down face first." (Rentas Dep. at 92:2–21.) According to Cafarella, after Breitkopf went down, Cafarella "leaned over, stretched out, the magazine had come off the shoulder, I grabbed it and dragged it out." (Cafarella Dep. at 102:6–12; *see also* Jaklitsch Dep. at 50:19–51:3 (testifying that, after Breitkopf fell, Cafarella ran over, grabbed the rifle, and pulled the strap off Breitkopf).) Jaklitsch grabbed Cafarella by the neck and asked him what he was doing, and told Kiesel to keep Cafarella nearby. (Jaklitsch Dep. at 51:3–14.) NCPD Officer Thomas Lively ("Lively") was attempting to handcuff Breitkopf on the ground when Rentas ran over and displayed his shield, and Lively then realized he knew Breitkopf. (Deposition of Thomas Lively ("Lively Dep.") at 47–49, MTA & Ramos Motion Ex. P; Rentas Dep. at 75:7–76:20.) The officers then began trying to save Breitkopf's life. (Jaklitsch Dep. at 51:14–17.)

Less than ten minutes elapsed between the first police contact with Anthony DiGeronimo and Breitkopf being shot. (Pl. Cafarella 56.1 Suppl. ¶ 59.) On February 28, 2012, the Nassau County District Attorney's Office issued a report on Anthony's and Breitkopf's deaths, and, based on the totality of the circumstances, declined to bring criminal charges against Gentile for killing Breitkopf. (*See generally* DA Report.)

---

and two others saw the shield right before and after Breitkopf was placed in the ambulance. (*See* Pl. MTA & Ramos 56.1 Counterstatement ¶ 36; Pl. MTA & Ramos 56.1 Suppl. ¶¶ 105–07.)

[11] Jaklitsch initially testified that the men were MTA officers. (Jaklitsch Dep. at 48:14–25.) He later said, "I don't know if I had time to formulate an opinion, whether it was a Nassau cop or MTA cop." (*Id.* at 53:23–54:2.) Jaklitsch also could not recall how far they were from Breitkopf—whether at arm's length or five or more feet. (*Id.* at 107:13–108:19.)

### 4. MTA Police Officer Training

#### a. NYPD Academy Training

##### i. 2004 and 2006 Training Program

Pursuant to a contractual agreement with the City, MTAPD recruits attend a six-month program at the NYPD Academy, which provides classroom and tactical training identical to that provided to NYPD recruits. (MTA & Ramos 56.1 ¶ 37; NYC 56.1 ¶ 6.) Recruits receive three months of academic training and three months of hands-on training, and the program covers approximately forty different subjects. (NYC 56.1 ¶¶ 3, 9.) Ramos completed the program in 2004, and Gentile completed it in 2006. (MTA & Ramos 56.1 ¶ 38.)

Recruits are instructed to review the NYPD Police Student's Guide, which addresses the use of force, including the "escalating scale of force" and the circumstances in which using deadly physical force is appropriate. (NYC 56.1 ¶ 13; Police Student's Guide: 2004 Use of Force Chapter, NYC Motion Ex. F; Police Student's Guide: 2006 Use of Force Chapter, NYC Motion Ex. G; MTA & Ramos 56.1 ¶ 39.) The NYPD's standard for use of force is more restrictive than the penal law standard. (NYC 56.1 ¶ 14.) Recruits are taught (1) to use firearms as a last resort, and to use only the minimal amount of force necessary in all cases; (2) to use deadly force only if there is no other way to protect the officer or another person against imminent death or serious physical injury; and (3) where feasible and consistent with personal safety, to give some warning before shooting. (*Id.* ¶ 16.) Recruits also learn that the standard challenge in armed confrontations is: "Police! Don't move!" (*Id.* ¶ 17.) The subject matter is covered in classes and includes audiovisual presentations and role play scenarios. (MTA & Ramos ¶ 40.) According to NYPD

Sergeant Aaron Lai, there may be "impromptu" role plays, where they "create a scenario and just try to use some of the guidelines, to reenact some of the guidelines to see, and then we have a discussion as to what if the recruit were to fire and was that appropriate or not based on the guidelines." (Deposition of Aaron Lai ("Lai Dep.") at 74:18–75:4, MTA & Ramos Motion Ex. T.) Recruits also receive "judgmental firearms training via the firearms training simulator," a computer-based program that requires the recruit to exercise her "understanding of the use of force guidelines, and escalating scale of force," in various scenarios. (MTA & Ramos 56.1 ¶ 43.)

The firearms tactical training includes close combat training, cover and concealment, a simulator workshop, identification of plainclothes officers in confrontation situations, and a full day in a tactical house and village with simulations. (NYC 56.1 ¶ 36.) For one day during the tactical firearms training, recruits are lectured on confrontation situations, including how "to safely resolve confrontation[s] between members of service both on and off duty." (MTA & Ramos 56.1 ¶¶ 41–42; *see also* NYC Motion ¶¶ 20, 21; Plaintiff's Supplementary Facts in Response to NYC's Rule 56.1 Statement ("Pl. NYC 56.1 Suppl.") ¶ 3.) One of the fourteen lectures is about identifying members of the service in civilian clothes. (Pl. MTA & Ramos Counterstatement ¶ 42.) Recruits are instructed that the "challenging officer"—the uniformed officer who comes upon the scene and observes an unidentified person—should (1) take cover to the rear of the "confronted officer"—the officer in plainclothes who may be armed and may be taking police action—if possible; (2) issue the standard challenge of "Police! Don't move!"; (3) request that the confronted officer give the exact location of his or her identification and produce that identification

slowly; and (4) examine the confronted officer's identification to ensure that it is valid. (NYC 56.1 ¶ 23.) The confronted officer is instructed to (1) remain motionless, even if it means that a fleeing suspect escapes; (2) obey all directions from the challenging officer; (3) inform the challenging officer of the location of identification before moving; and (4) produce the identification slowly, in a controlled manner, without unnecessary movement. (*Id.* ¶ 24.) Recruits are instructed to follow the confrontation procedure in incidents involving potential officers from any law enforcement agency. (*Id.* ¶ 25.) The material taught in lectures is reinforced in scenario training in the tactics house and tactics village. (MTA & Ramos 56.1 ¶ 42.)

Ramos and Gentile completed the firearms and tactical training. (*Id.* ¶ 62–63.)

## ii.    2008 RAND Evaluation

In 2007, then-NYPD Commissioner Raymond Kelly charged the RAND Corporation ("RAND") to undertake a comprehensive review of the NYPD's firearms training. (Pl. NYC 56.1 Suppl. ¶ 9; *see* Evaluation of the New York City Police Department Firearm Training and Firearm-Discharge Review Process ("RAND Report"), NYC Opp. Ex. W.) With respect to confrontation training, role-playing workshops, and simulations, RAND found that "[t]he NYPD engages in a substantial amount of complex-skill training using role-playing exercises," but concluded, *inter alia*, that "recruit training could be significantly improved by increasing the quality, number, and use of scenario-based training events that each recruit experiences." (RAND Report, at 31.) RAND noted that the NYPD's "failure to ensure that students have internalized the right way to approach situations by providing sufficient opportunities to practice what they have

been taught may create an inappropriate response on the street and is a shortcoming in the NYPD recruit-training program." (*Id.* at xvii.) RAND also noted that, during the "complex-skill training events," instructors did not respond to recruit error by demonstrating the correct behavior themselves. (*Id.* at 27.)

RAND issued several recommendations to improve the training. (*E.g.*, *id.* at xviii–xix.) The MTA was unaware of the report and its recommendations before Breitkopf's death. (*See* Pl. NYC 56.1 Suppl. ¶ 17.)

## iii.    New York State Task Force on Police-on-Police Shootings

In 2010, a task force empaneled by then-New York State Governor David Paterson examined issues and implications arising from police-on-police shootings, including confrontations with plainclothes officers. (Reducing Inherent Danger: Report of the Task Force on Police-on-Police Shootings ("Task Force Report"), NYC Opp. Ex. Z.) Governor Paterson empaneled the Task Force after the shooting deaths of two off-duty Black police officers in the state in 2008 and 2009. (*Id.* at 1.) According to the report, there were twenty-six fatal police-on-police, mistaken-identity shootings from 1971 to 2009. (*Id.* at ii.) From 2006 to 2010, there were three fatal mistaken-identity police-on-police shootings in New York. (NYC's Counterstatement in Response to Plaintiff's Supplementary Rule 56.1 Statement ("NYC 56.1 Suppl. Opp.") ¶ 22.) None of these, however, involved the MTA.

The Task Force issued a series of recommendations to help prevent police-on-police shootings, including (1) developing state and national protocols for police-on-police confrontations, such as a suggestion that confronted officers do not move or reflexively spin and instead identify themselves loudly while using specific

language, a suggestion that challenging officers not stereotype and clearly shout and identify themselves, and a suggestion that the challenging officer broaden her focus from the gun to assess the situation; (2) increasing the use of simulations and role-playing; and (3) developing testing and training to reduce unconscious racial bias. (Task Force Report, at 54–67.)

b. MTAPD In-Service Training

After MTAPD officers graduate from the Academy, the MTA conducts an orientation regarding the policing of railroad facilities, and three months of field training in the MTA's geographical regions. (MTA & Ramos 56.1 ¶ 44.) Police-on-police confrontations are discussed (*id.* ¶ 45), but the MTA conducted no related field or in-service scenario training before March 2011 (Pl. MTA & Ramos Counterstatement ¶ 45).

All officers receive the MTAPD manual, which details a "use of force" policy. (MTA & Ramos 56.1 ¶ 46.) The policy instructs officers that "[t]he primary duty of Members is to preserve human life," explains the "use of force continuum," and admonishes that deadly physical force may be used only to "protect the Member or others from what is reasonably believed to be a threat of imminent death or serious physical injury." (*Id.* ¶ 47.) It provides that, "[w]here feasible, and consistent with personal safety," the officer should identify herself as an officer and "give some warning prior to discharging a firearm in a deadly physical force situation." (MTAPD Manual, MTA & Ramos Motion Ex. AA, at 0169.)

The manual also contains a policy on "plainclothes police encounters," which establishes "guidelines to assist Members in safely resolving confrontations between law enforcement personnel both on and off duty where a police officer's identity is not clear." (MTA & Ramos 56.1 ¶ 48.) The policy delineates the responsibilities of the challenging and confronted officers in a police-on-police encounter, emphasizing that "[i]n any confrontation, the burden of proving identity rests on the confronted officer, whether on or off-duty; however, the challenging officer also has the responsibility to use sound tactics and judgment approaching the situation." (MTAPD Manual, MTA & Ramos Motion Ex. BB, at 0189.) When confronting an unidentified armed person who may be a law enforcement officer, the MTAPD officer should identify herself as an officer, attempt to verify the situation if the other person states that she is an officer, and remain alert until completely satisfied with the identification. (*Id.* at 0190.)

According to the MTA, the policies are reinforced annually during mandatory firearms requalification. (MTA & Ramos 56.1 ¶ 50.) Plaintiff, on the other hand, contends that, before Breitkopf's death, the MTAPD did not provide hands-on training on all of these policies, including the plainclothes officer and police-on-police confrontations policies.[12] (*E.g.* Pl. MTA & Ramos 56.1 Counterstatement ¶¶ 45, 48, 50.) Specifically, according to the MTA, officers are lectured on the use of deadly physical force and receive a written examination to assure they have mastered the material. (*Id.* ¶ 51.) For example, the "Deadly Physical Force" Lesson Plan delineates a progression of force that officers should follow, and provides that "[a] stage in the progression may be skipped due the circumstances," although "[i]f possible, the police officer should give the

---

[12] MTAPD Deputy Chief John D'Agostino acknowledged the importance of training officers on how to handle plainclothes police encounters and agreed that more training would better equip the officers to do so. (NYC 56.1 Suppl. ¶ 25.)

subject the opportunity to comply at each stage." (MTAPD Lesson: Deadly Physical Force, MTA & Ramos Opp. Ex. DD, at Bates #207–08.) Plaintiff emphasizes that the MTAPD Manual instructs officers who challenge an unidentified armed person to "[i]dentify [them]self in a loud clear voice by stating 'Police! Don't move.'" (Pl. MTA & Ramos 56.1 Counterstatement ¶ 50.) In addition, all MTA officers must complete a "course of fire" on the firearms range, consisting of multiple drills and instruction on cover, concealment, and tactics. (MTA & Ramos 56.1 ¶ 52.) The drills are conducted at various distances and include "police challenge" or "shoot/don't shoot" exercises in which the officer must determine whether a target, which flips to one side or the other, poses a deadly threat. (*Id.* ¶ 53.) According to MTAPD Training Sergeant Glenn Pleeter ("Pleeter"), in one drill, the officer is trained to fire if the officer sees a weapon when the target flips; no verbal command is necessary beforehand. (Deposition of Glenn Pleeter ("Pleeter Dep.") at 77:2–78:2, MTA & Ramos Motion Ex. V; *see also id.* at 56:14–25 (stating that officer is told "obviously to shoot, if there is a gun," when the target flips).)[13] If the target is unarmed, however,

the officer should cover the target; yell "Police, don't move!"; and refrain from shooting. (MTA & Ramos 56.1 ¶ 54.)

### 5. Causes of Action

Plaintiff brings six counts for relief:

(1) 42 U.S.C. § 1983 claims against Gentile and Ramos for violating Breitkopf's right under the Fourth and Fourteenth Amendments (First Amended Complaint ("FAC") ¶¶ 22–53, Docket No. 39)[14];

(2) "Civil rights" claims against the MTA and NYC for failing to adequately train Gentile and Ramos (FAC ¶¶ 54–82);

(3) State law negligence, wrongful death, and GML § 205-e claims against the DiGeronimos (FAC ¶¶ 83–88);

---

[13] As discussed in more detail *infra*, although plaintiff's counsel attempts to argue that this drill during the annual firearms requalification is deficient because it does not allow for a verbal warning, the Court disagrees. Plaintiff has pointed to no evidence in the record that the gun is displayed during the flip drill in a manner that would make a warning feasible. In other words, if the target is pointing a gun at the officer when it flips, no warning would be feasible or necessary. Moreover, there is no testimony from any MTAPD member that officers were instructed to disregard the guidelines in the MTAPD Manual, or that they believed the firearms requalification drill procedures trumped the guidelines in the Manual. Gentile also has not testified that he decided to shoot Breitkopf immediately because of his experience and training during the firearms requalification. In other words, Gentile acknowledged that he knew from his training that, where feasible, the challenging officer

must give the unidentified armed person the opportunity to identify himself or herself and comply to help deescalate the situation in case the person is a plainclothes or off-duty police officer. Despite receiving such training, however, Gentile concluded it was not feasible. Thus, the dispute regarding this drill does not raise a genuine issue of material fact that precludes summary judgment.

[14] Allegations of the use of excessive force generally are analyzed under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."); *Taylor v. Nassau Cnty.*, 11-CV-0934 (SJF), 2012 WL 5472554, at *1 n.2 (E.D.N.Y. Mar. 5, 2012) (deciding to address excessive force claim brought under Fourth and Fourteenth Amendment under Fourth Amendment only). Plaintiff did not dispute that the due process standard is inapplicable. (*See* MTA & Ramos Motion, at 14.) Therefore, the Court concludes that plaintiff has abandoned her § 1983 claims to the extent they are based on violations of the Fourteenth Amendment, and, in any event, the Court concludes that any such claim should be analyzed under the Fourth Amendment.

(4) State law negligence, wrongful death, and GML § 205-e claims against the Estate (FAC ¶¶ 89–92);

(5) State law negligence, wrongful death, and GML § 205-e claims against Cafarella (FAC ¶¶ 93–103); and

(6) State law battery, wrongful death, and GML § 205-e claims against Gentile and Ramos, and against the MTA based on *respondeat superior* (FAC ¶¶ 104–14).

## B. Procedural Background

Plaintiff commenced this action on March 6, 2012, and filed an amended complaint on July 17, 2012. In their respective answers to both the original and amended complaints, each defendant asserted cross-claims against other defendants. Cafarella moved for summary judgment on December 2, 2013. The DiGeronimos filed their motion on December 6, 2013; Gentile, the MTA and Ramos, and NYC filed their motions on December 13, 2013. Plaintiff filed her oppositions on March 7, 2014. The DiGeronimos filed their reply on April 2, 2014, while the other moving defendants filed their replies on April 4, 2014. The Court held oral argument on May 5, 2014. Plaintiff filed a sur-reply to the City on May 7, 2014. The Court has fully considered the submissions of the parties.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise

properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

### III. DISCUSSION

Plaintiff's theories of liability under federal and state law differ from defendant to defendant. Thus, the Court proceeds by addressing each claim separately. For the reasons set forth below, the Court concludes that genuine issues of material fact preclude summary judgment on plaintiff's excessive force claim against Gentile, the corollary state law assault and battery claims against Gentile and the MTA, and the negligence and GML § 205-e claims against Cafarella.

### A. 42 U.S.C. § 1983 Claims

Plaintiff brings 42 U.S.C. § 1983 claims against Gentile, Ramos, the MTA, and the City. To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under the color of state law. 42 U.S.C. § 1983; *see also Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999). Section 1983 does not itself create substantive rights; instead, it offers "a method for vindicating federal rights elsewhere conferred." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004).

Further, to hold a municipality liable under Section 1983, a plaintiff must show: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) (citations omitted); *see also Monell v. Dep't of Social Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978).

It is undisputed that Gentile and Ramos acted under color of state law. The questions presented, therefore, are: (1) whether Ramos's and Gentile's conduct deprived Breitkopf of his Fourth Amendment rights when (a) Ramos grabbed Breitkopf after hearing Cafarella yell "gun" (or "drop your weapon") and (b) Gentile shot Breitkopf after seeing his interaction with Ramos; (2) whether, in the alternative, Ramos and Gentile are entitled to qualified immunity; (3) whether the MTA was deliberately indifferent to the need to train its officers on how to identify and properly confront plainclothes officers; and (4) whether the City is liable under Section 1983 because the MTAPD officers were trained at the Academy. The Court also addresses the disputed negligence claim against the City.

#### 1. Excessive Force and Qualified Immunity

The officers argue that the excessive force claims cannot survive summary judgment because the force employed—Ramos grabbing Breitkopf and the rifle, and Gentile shooting Breitkopf—was objectively reasonable. In the alternative, the officers contend they are entitled to qualified immunity. As set forth below, the Court concludes that there is insufficient evidence in the record, even when construed most favorably to plaintiff, for the excessive force claim against Ramos to survive summary judgment both on the merits and on qualified immunity grounds. There is

sufficient evidence, however, if plaintiff's evidence is credited and all reasonable inferences are drawn in her favor, for the claim against Gentile to survive, because there is a genuine dispute of material fact as to whether Gentile's split-second decision to shoot Breitkopf was objectively reasonable. Similarly, the disputed issues of fact concerning the circumstances surrounding the shooting preclude summary judgment on the qualified immunity issue.

### a. Excessive Force Standard

A police officer's use of force is excessive, in violation of the Fourth Amendment, "if it is objectively unreasonable 'in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham*, 490 U.S. at 397). More specifically, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). Physical force is often necessary, and thus, "not every push or shove" is unconstitutionally excessive, "even if it may later seem unnecessary in the peace of a judge's chambers." *Maxwell*, 380 F.3d at 108 (internal brackets, citation, and quotation marks omitted).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *accord Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). The court must inquire into the totality of the circumstances, "including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000) (citations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

There may be certain circumstances where the alleged unconstitutional act and injury are so *de minimis* that they cannot constitute a constitutional violation as a matter of law. *See, e.g.*, *Vogeler v. Colbath*, No. 04–CV–6071 (LMS), 2005 WL 2482549, at *11 (S.D.N.Y. Oct. 6, 2005) (granting summary judgment for defendant where plaintiffs failed to demonstrate that alleged action by police officer "was any more than de minimis force exerted during the course of an arrest following the raid of a suspected drug trafficking locale"); *Johnson v. Police Officer # 17969*, No. 99–CV–3964 (NRB), 2000 WL 1877090, at *5 (S.D.N.Y. Dec. 27, 2000) (dismissing excessive force claim based on admission that plaintiff resisted arrest and only alleged minor injuries); *cf. Tierney v. Davidson*, 133 F.3d 189, 199 (2d Cir. 1998) (finding qualified immunity existed for excessive force claim under Due Process Clause, where claim was related to police conduct toward individuals present during execution of search, because force used "was de minimis, necessary, appropriate, and benign"); *Griffin v. Crippen*, 193 F.3d 89, 92 (2d Cir. 1999) (noting, in addressing excessive force claim under Eighth Amendment, that "*de minimis* uses of force generally do not suffice to state a constitutional claim"). A plaintiff, however, need not sustain a severe injury to maintain

a claim that the use of force was objectively unreasonable under the Fourth Amendment. *See Maxwell*, 380 F.3d at 108 ("[W]e have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising." (citing *Robison v. Via*, 821 F.2d 913, 924–25 (2d Cir. 1987))); *Weather v. City of Mount Vernon*, No. 08 Civ. 192(RPP), 2011 WL 1046165, at *11 (S.D.N.Y. Mar. 22, 2011) ("Under the law, police are not permitted to use any degree of force in all instances—in some circumstances, no use of force is reasonable because none is required."), *aff'd*, 474 F. App'x 821 (2d Cir. 2012); *see also Hayes v. N.Y.C. Police Dep't*, 212 F. App'x 60, 62 (2d Cir. 2007) ("[W]e have permitted claims to survive summary judgment where the only injury alleged is bruising."); *Davenport v. Cnty. of Suffolk*, No. 99-CV-3088 (JFB), 2007 WL 608125, at *11 (E.D.N.Y. Feb. 23, 2007) (use of force causing *de minimis* injury could be excessive if "gratuitous").

With respect to deadly force, "an officer's decision to use deadly force is objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) (internal quotation marks omitted); *see also Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). In such cases, "the objective reasonableness inquiry, for purposes of either Fourth Amendment liability or qualified immunity, 'depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that

he made the split-second decision to employ deadly force.'" *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36–37 (2d Cir. 2003) (quoting *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996), and citing *Graham*, 490 U.S. at 396; *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994)). Therefore, "[t]he objective reasonableness test will not be met if, on an objective basis, it is obvious that no reasonably competent officer would have concluded in that moment that . . . use of deadly force was necessary." *Id.* at 37 (internal citation and quotation marks omitted); *see also Keene v. Schneider*, 350 F. App'x 595, 596 (2d Cir. 2009) (explaining that, even if the force used was objectively unreasonable, "an officer may still be eligible for qualified immunity if it was objectively reasonable for the officer to *believe* that her action did not violate clearly established law" (citing *Salim*, 93 F.3d at 89) (emphasis in original)); *Salim*, 93 F.3d at 89 ("The objective reasonableness test [for qualified immunity purposes] is met if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))). This is because qualified immunity "protects officers from the 'sometimes hazy border between excessive and acceptable force.'" *Keene*, 350 F. App'x at 596 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

b.  Qualified Immunity Standard

According to the Second Circuit, qualified immunity shields a government official from liability for civil damages if the official's "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that [her] conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding v. Tollaksen*, 257 F. App'x 400, 401 (2d Cir. 2007) (setting forth same).

Qualified immunity shields an official even if her conduct resulted from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). As the Second Circuit has noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)). Thus, qualified immunity is not merely a defense, but is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, a court should determine the availability of qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"A right is clearly established when the contours of the right [are] sufficiently clear that a reasonable official would understand that what [she] is doing violates that right. . . . The unlawfulness must be apparent." *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1998) (quotation marks omitted). Even where the plaintiff's rights are clearly established, however, the qualified immunity defense protects the government actor if it was objectively reasonable for her to believe her actions were lawful at the time of the challenged act. *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). "The objective element of this test requires the court to look beyond the generalized constitutional protection, such as the right to be free of unreasonable searches and seizures, and to determine whether the law is clearly established in a more particularized sense," given the specific factual situation with which the officer is confronted. *Kerman v.*

*City of New York*, 261 F.3d 229, 236 (2d Cir. 2001).[15]

With respect to summary judgment, the Second Circuit has held that a court should cloak a defendant with qualified immunity at this juncture "only . . . when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)); *see also Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (holding that finding qualified immunity at summary judgment stage is appropriate "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[] and with all permissible inferences drawn in [the plaintiff's] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right'" (quoting *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996))); *see also Stancuna v. Sherman*, 563 F. Supp. 2d 349, 356 (D. Conn. 2008) ("Here, the court finds that summary judgment on qualified immunity grounds is inappropriate. As the Second Circuit has held, when a motion for summary judgment is made in the context of a qualified immunity defense, the question of whether the factual disputes are material is even more critical. As noted above, there are

---

[15] "In a case involving the use of deadly force," as here with respect to Gentile's conduct, "only the objective reasonableness branch of this test presents any possibility for a qualified immunity defense." *O'Bert*, 331 F.3d at 36 (citing *Salim*, 93 F.3d at 91).

issues of material fact in this case that this court may not decide. These issues of fact are critical to determining whether Sherman was operating under a reasonable belief as to what kind of search he was permitted to conduct." (internal citation, alteration, and quotation marks omitted)).[16]

### c. Application to Ramos's Actions

Ramos argues that summary judgment is appropriate because his actions were objectively reasonable and, regardless, any injury to Breitkopf was *de minimis*. Plaintiff counters that a reasonable jury could hold Ramos liable because his "actions in grabbing Breitkopf and attempting to wrest his rifle were precipitous and not 'objectively reasonable' since Officer Breitkopf's gun was pointed down," Breitkopf had passed several NCPD officers without issue, and Ramos did not issue a warning. (MTA & Ramos Opp., at 18.) Plaintiff claims that this "precipitous act . . . was both a catalyst and a proximate [cause] for Officer Gentile negligently discharging his weapon." (*Id.*) Viewing the evidence and drawing all reasonable inferences in the light most favorable to plaintiff, the Court concludes that no rational jury could find that Ramos acted unreasonably under the circumstances. Further, any injury to Breitkopf from Ramos's seizure alone—irrespective of Gentile's independent conduct in response to Ramos's actions, *cf. Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995) ("[E]vidence that [the officers]

created the need to use [deadly] force by their actions prior to the moment of seizure is irrelevant. . . .")—was *de minimis* and cannot support an excessive force claim.[17]

It is uncontroverted that Ramos only employed force against Breitkopf when, after hearing Cafarella say "gun" or "drop the weapon" (the actual phrase being immaterial to assessing Ramos's liability), Ramos saw an armed man in plainclothes and, in an attempt to "subdue what [he] assumed was a threat," grabbed the man's right shoulder and grasped for the rifle, which was pointed downward at that moment. (MTA & Ramos 56.1 ¶¶ 26–28.) There is no evidence that Ramos employed or directed anyone to employ deadly force, continued to employ physical force despite hearing someone identify Breitkopf or seeing Breitkopf submit to his authority, or injured Breitkopf by grabbing him.

Given these uncontroverted facts, even drawing all reasonable inferences in plaintiff's favor, no rational jury could find that Ramos's *de minimis* use of force was objectively unreasonable. *Compare Rodriguez v. Vill. of Ossining*, 918 F. Supp. 2d 230, 238 (S.D.N.Y. 2013) (granting summary judgment to officer who grabbed plaintiff's arm to try to remove her from vehicle to arrest her where there was no allegation that officer hurt plaintiff in any way besides scratching her, scratch was not alleged to have been remotely painful or serious, and plaintiff conceded that officer had probable cause), *and Jennejahn v. Vill. of Avon*, 575 F. Supp. 2d 473, 476, 481 (W.D.N.Y. 2008) (where probable cause existed for arrest, finding assertions about

---

[16] District courts have "discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *al-Kidd*, 131 S. Ct. at 2080; *see Pearson*, 555 U.S. at 236 (explaining that every court of appeals or district court judge is "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

[17] Plaintiff does not argue Ramos can be held liable for Gentile's decision to use deadly force, and the Court does not conclude otherwise. The officers acted independently.

arresting officer's conduct—that officer "violently grabbed [the plaintiff's] arm, spun him around, released his arm and forcefully grabbed his shoulders"—"coupled with the absence of any injuries therefrom" insufficient to withstand summary judgment), *with Murray v. Williams*, No. 05–CV–9438 (NRB), 2007 WL 430419, at *7 (S.D.N.Y. Feb. 7, 2007) (refusing to find that alleged force was *de minimis* where plaintiff alleged laceration to his lower lip, a bloody nose, pain and suffering, and mental anguish), *Johnson v. City of New York*, No. 05–CV–2357 (SHS), 2006 WL 2354815, at *5 (S.D.N.Y. Aug. 14, 2006) (denying summary judgment on claim of excessive force during search and noting that "[w]hile not every push or shove violates the Fourth Amendment, . . . there surely would be no objective need to 'stomp' and 'kick' an individual already under police control" (citations and quotations omitted)), *and Pierre–Antoine v. City of New York*, No. 04–CV–6987 (GEL), 2006 WL 1292076, at *4 (S.D.N.Y. May 9, 2006) (holding that repeatedly striking subdued individual would constitute objectively unreasonable use of force under Fourth Amendment); *see also Lemmo v. McKoy*, No. 08-CV-4264 (RJD), 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011) ("Injuries held to be de minimis for purposes of defeating excessive force claims include short-term pain, swelling, and bruising[;] brief numbness from tight handcuffing. . .[;] and two superficial scratches with a cut inside the mouth." (citations omitted)); *Hayes v. City of Indianapolis*, No. 1:08-cv-006-DFH-JMS, 2009 WL 700232, at *4 (S.D. Ind. Mar. 16, 2009) ("[A] police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders."); *Norris v. Bain*, No. 1:04–CV–1545, 2006 WL 753131, at *14 (S.D. Ind. Mar. 21, 2006) ("[It is] well established that the use of force unnecessary for an arrest,

particularly where force is applied to a suspect who is not fleeing or resisting, and who has been overcome, cannot be considered constitutionally reasonable.").

Plaintiff's counterarguments are unavailing. She relies on the fact that Breitkopf had passed other NCPD officers before encountering Ramos. Yet, there is no evidence from which a reasonable jury could conclude that Ramos had seen Breitkopf before Cafarella's "gun" announcement changed the circumstances confronting Ramos. *See Graham*, 490 U.S. at 397 (explaining that a police officer's application of force is excessive if it is objectively unreasonable "in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation"). Plaintiff also argues that, instead of grabbing Breitkopf, Ramos should have pulled his weapon and commanded Breitkopf not to move. Although that also would have been an objectively reasonable response, the existence of an alternative approach does not render the one chosen by Ramos to be objectively unreasonable.[18] Given the uncontroverted facts, no rational jury could find Ramos's *de minimis* use of force objectively unreasonable.

In sum, in light of the facts and circumstances confronting Ramos, the Court concludes that no reasonable jury could find that Ramos lacked a "reasonable basis to think that the person stopped pose[d] a

---

[18] Moreover, plaintiff points to no authority holding that it is objectively unreasonable for an officer to confront an armed, unidentified individual simply because that individual's weapon is pointing downward, or that an officer must issue a verbal warning prior to using non-deadly force to neutralize a potential threat. Thus, as discussed *infra*, the Court concludes in the alternative, that Ramos' conduct in this case would be protected by qualified immunity.

present physical threat to" the officers at the scene or others, or that Ramos took more than the "necessary measures . . . to neutralize the threat." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004); *see also James v. Chavez*, 830 F. Supp. 2d 1208, 1236 (D.N.M. 2011) ("To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least, or even a less forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under *Graham v. Connor*.").

Moreover, even assuming *arguendo* that Ramos used objectively unreasonable force, his belief in the lawfulness of his actions, in light of the circumstances before him—including, *inter alia*, the yelling of "gun" and the proximity of the armed man to him—was objectively reasonable. *See Keene*, 350 F. App'x at 596 ("Even if the force is objectively unreasonable, an officer may still be eligible for qualified immunity if it was objectively reasonable for the officer to *believe* that her action did not violate clearly established law." (emphasis in original) (citing *Salim*, 93 F.3d at 89)); *accord DiGennaro v. Town of Gates Police Dep't*, No. 07-CV-6426 CJS, 2013 WL 3097066, at *14 (W.D.N.Y. June 18, 2013); *cf. Jackson v. City of New York*, 939 F. Supp. 2d 235, 257–58 (E.D.N.Y. 2013) ("Although an officer relying on a fellow officer's report would have been reasonable in mistakenly believing he had probable cause to initiate an arrest for reported—not observed—criminality, no reasonable officer could have believed that using any force whatsoever against Plaintiff was lawful under the circumstances where Officer Johnston did not describe any need for force and where Officer Dammacco did not observe any criminal activity by Plaintiff."). As the Supreme Court and Second Circuit have emphasized, "qualified immunity protects officers 'from the sometimes hazy

border between excessive and acceptable force.'" *Keene*, 350 F. App'x at 596 (quoting *Brosseau*, 543 U.S. at 198).

Here, whether a different approach may have been "preferable," as plaintiff's counsel framed it at oral argument, does not create a genuine dispute of material fact as to whether *no* other reasonably competent officer would believe it was lawful to respond as Ramos did. In other words, it is clear that officers of reasonable competence could disagree as to the legality of Ramos's actions—namely, whether it was unlawful to grab an armed man when someone else yells gun and the armed man is in close proximity to the officer—especially in light of the split-second nature of the decision and the *de minimis* force used by Ramos. Thus, in the alternative, the Court concludes that Ramos is entitled to summary judgment on qualified immunity grounds.

Accordingly, the Court grants summary judgment to Ramos on the excessive force claim against him under Section 1983.[19]

_____

[19] Because claims for battery under New York law are judged under the Fourth Amendment's objective reasonableness standard, *e.g.*, *Crews v. Cnty. of Nassau*, No. 06-CV-2610 (JFB)(GRB), 2014 WL 558696, at *17 (E.D.N.Y. Feb. 11, 2014); *Gilliard v. City of New York*, No. 10-CV-5187 (NGG)(CLP), 2013 WL 521529, at *10 (E.D.N.Y. Feb. 11, 2013), the Court also grants summary judgment to Ramos on the state law battery claim. This determination also disposes of plaintiff's wrongful death claim against Ramos, because "[t]o succeed on a cause of action to recover damages for wrongful death, the decedent's personal representative must establish, *inter alia*, that the defendant's wrongful act, neglect, or default caused the decedent's death." *Eberts v. Makarczuk*, 861 N.Y.S.2d 731, 732 (N.Y. App. Div. 2008); *see also Chong v. N.Y.C. Transit Auth.*, 441 N.Y.S.2d 24, 25–26 (N.Y. App. Div. 1981) (defining elements of wrongful death claim as: (1) death of a human being, (2) negligence of a defendant causing death, (3) survival of distributees suffering pecuniary

#### d. Application to Gentile's Actions

Gentile argues that no reasonable jury could find that the use of deadly force was objectively unreasonable, because Breitkopf approached the scene alone and in plainclothes while carrying the M4 rifle, did not wear a visible shield, did not identify himself when confronted by Ramos and two NCPD officers, and moved his rifle in such a way that it pointed to people at the scene. In most friendly-fire cases, disputed issues of fact preclude a determination on summary judgment as to whether the shooting officer's actions were objectively reasonable, or as to whether the officer is entitled to qualified immunity. *See, e.g.*, *Ngo v. Stoolie*, Civ. No. 03-3376, 2006 WL 1579873, at *7 (D. Minn. June 2, 2006) ("In cases involving a police officer shooting another police officer, courts have generally concluded that the shooting officer is not entitled to qualified immunity because the court cannot say, as a matter of law, that the shooting officer made a reasonable mistake in shooting a fellow officer; courts allow a jury to decide whether the shooting officer's actions were objectively reasonable.") (collecting cases). The instant case is similarly one where the Fourth Amendment claim against Gentile cannot be resolved on summary judgment. As set forth below, the Court concludes that genuine issues of material fact preclude a finding at this juncture as to the objective reasonableness of Gentile's use of deadly force, as well as on the issue of qualified immunity.[20]

It is undisputed that Breitkopf arrived after the "slow down" order and approached in plainclothes while carrying an M4 rifle. However, there is a factual dispute as to whether Breitkopf's shield was visible before Gentile fired his weapon. Although Gentile argues this fact is uncontroverted because no witness testified that the shield was visible beforehand, the Court disagrees. Rentas and other individuals did see Breitkopf's shield around his neck after he began receiving medical attention at the scene. (*See* Pl. MTA & Ramos 56.1 Counterstatement ¶ 36.) Although it is possible the shield only became visible once Breitkopf's garments had been cut open for treatment (thereby exposing his neck and torso), that is not the only reasonable inference that could be drawn from the factual record. A rational jury could reasonably infer the shield was visible before the shooting, but just not observed by other officers given how rapidly the events unfolded. This disputed issue, regarding whether Breitkopf had visible identification and whether Gentile had information available showing that the victim was a police officer, is certainly material to assessing the objective reasonableness of Gentile's conduct, and, thus, must be resolved by the jury. *Compare Young v. City of Providence*, 404 F.3d 4, 14 (1st Cir. 2005) (off-duty officer was yelling "police, police," or "police, get out of the way," and "freeze," and witnesses understood he was an officer by his verbal commands and behavior), *and Ngo*, 2006 WL 1579873, at

---

loss because of the death, and (4) appointment of a personal representative of the decedent).

[20] As a threshold matter, the Court notes that Gentile's and Ramos's actions leading up to the shooting, including their failure to notify the MTAPD or NCPD that they were responding to the scene, are irrelevant to determining the objective reasonableness of Gentile's conduct at the moment he decided to employ deadly force. *See Salim*, 93 F.3d at 92 (concluding that because the inquiry is about circumstances immediately prior to and at moment officer made split-second decision to employ deadly force, plaintiff's faulting officer for various violations of police procedure, including failure to carry radio or call for back-up, or for failing to disengage when other children entered fray, were irrelevant).

*5 (finding genuine dispute as to whether shooting officer's failure to realize he was shooting an officer was reasonable where dispatcher gave information that plainclothes officer was on scene, and plainclothes officer was wearing vest with "police" written on it in reflective letters, flagged down police car, and one of two officers did not shoot because he realized the man was an officer), *with Pickens v. Harris Cnty.*, Civil Action No. H-05-2978, 2006 WL 3175079, at *13 (S.D. Tex. Nov. 2, 2006) (concluding that shooting officer's failure to recognize that victim was fellow officer was objectively reasonable because victim made no effort to identify himself as an officer when he joined on-duty deputies in chasing suspect, while carrying gun, and plaintiffs did not dispute that victim was wearing plain t-shirt).

Completely independent of this issue regarding the visibility of any police identification, however, there are other material facts in dispute that also preclude summary judgment. In other words, even if no police identification was visible, the determination of the "reasonableness" of Gentile's decision depends on which version of events one credits, as well as an evaluation of the objective reasonableness of Gentile's perception of an imminent threat. Specifically, if a jury credits Gentile's evidence that (1) Breitkopf refused an order by a uniformed officer to drop his weapon; (2) shrugged off Ramos's attempt to stop him and also struggled with two NCPD officers; (3) raised his rifle towards the officers and others at the scene; and (4) the events occurred so rapidly that no warning would have been feasible, then a reasonable jury could conclude that Gentile's use of deadly force was reasonable. *See, e.g.*, *Garner*, 471 U.S. at 11–12 ("[I]f the suspect threatens the officer with a weapon . . ., deadly physical force may be used if necessary to prevent escape, and if, where

feasible, some warning has been given."); *Salim*, 93 F.3d at 91–92 (reversing denial of summary judgment because defendant officer shot decedent "instinctively in reaction to seeing [the decedent's] hand on the barrel of his gun while the two were locked in a struggle" and officer "was being pummelled [sic] by more than five people" (internal quotation marks omitted)); *Biggs*, 2010 WL 4628360, at *4 (granting summary judgment to defendants where plaintiff stepped out of vehicle and began waving thirteen-inch knife over his head "in a threatening manner" seven to eight feet from officers, and did not comply with orders to drop knife even after officer warned plaintiff that he would be shot if he did not comply).

On the other hand, if certain evidence that is most favorable to plaintiff is credited, *i.e.*, that (1) no officer commanded Breitkopf to "drop your weapon" or gave him any other warning; (2) no NCPD officers struggled with Breitkopf (raising questions about the credibility of Gentile's and Ramos's testimony); (3) Breitkopf's assault rifle was pointing downward the entire time; and (4) it was feasible for Gentile to give a warning, then a reasonable jury could find that Gentile did not have to make the split-second judgment to shoot and, therefore, his use of deadly force was excessive. *See Young*, 404 F.3d at 14–15, 22–23 (holding that evidence was sufficient to support verdict that officer used excessive force, because "a jury could find that an objectively reasonable officer would have recognized [the man] as an officer, and thus would have recognized that he was not a threat and would not have shot him" based on evidence that the man identified himself as a police officer to others, he was holding his gun with two hands as an officer would and at a downward angle, and officers shot "extraordinarily quickly" without giving adequate warning); *Pickens*, 2006 WL 3175079, at *13 (reasonable jury could find

that officer used excessive force in friendly-fire incident where there were disputes as to whether shooter warned victim to drop gun before firing and whether victim was running away from or turning towards shooter when firing began); *see also Hickey v. City of New York*, No. 01-CV-6506, 2004 WL 2724079, at *6 (S.D.N.Y. Nov. 29, 2004) (denying summary judgment where plaintiffs "claim[ed] the shooting was provoked by little more than the appearance of Walter Hickey on his porch, with a cell phone strapped to his waist," while defendants claimed that Hickey "emerged from his home, threatening to shoot them, and holding what appeared to be a gun in a firing position").

In short, although "police officers are often forced to make split-second judgments," *Graham*, 490 U.S. at 397, the Court cannot hold that Gentile merits summary judgment simply because he became aware of and involved in the situation a second or two before he fired. Although a rational jury could certainly credit the evidence in the record that supports Gentile's version of the events, which would warrant a finding that his split-second decision to shoot was objectively reasonable and did not constitute excessive force, that finding is contingent upon the resolution of various factual disputes in the record, and conflicting reasonable inferences that could be drawn from such facts. In other words, if the evidence is construed most favorably to plaintiff, a reasonable factfinder could conclude that Gentile's decision to not further assess the situation despite what he saw, and not to issue a verbal warning—which could have given Breitkopf time to identify himself—was objectively unreasonable. Therefore, the Court concludes that there are genuine disputes of material fact that preclude summary judgment as to whether Gentile used excessive force by shooting Breitkopf.

Accordingly, the Court denies summary judgment to Gentile on the excessive force and state law battery and wrongful death claims.[21]

Similarly, the above-referenced factual disputes also prevent the Court from determining at the summary judgment stage that Gentile merits qualified immunity. The question of whether it was objectively reasonable for Gentile to believe he was not violating Breitkopf's rights cannot be determined until these factual disputes are resolved. *See Ngo*, 2006 WL 1579873, at *7; *Cowan*, 352 F.3d at 764 (denying summary judgment on qualified immunity grounds having already determined that there were disputed facts regarding the reasonableness of the officer's conduct); *Benson v. Yaeger*, No. 05-CV-784, 2009 WL 1584324, at *7 (W.D.N.Y. June 3, 2009) ("[T]he only issue is whether the Officers' conduct was objectively reasonable—the very question upon which this Court has found there are genuine issues of material fact. Because the factual disputes as to the objective reasonableness of the Officers' conduct overlap in both the excessive force context and the qualified immunity context, summary judgment must be denied here."). In other words, even assuming *arguendo*

---

[21] "Unlike cases brought under § 1983, municipalities may be liable for the common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of *respondeat superior*." *L.B. v. Town of Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002). "No municipal custom or policy need be proven to establish the liability of the [municipality] for violation of . . . state law, for '[m]unicipalities surrendered their common-law tort immunity for the misfeasance of their officers and employees long ago.'" *Lore v. City of Syracuse*, 670 F.3d 127, 168 (2d Cir. 2012) (quoting *Tango v. Tulevech*, 61 N.Y.2d 34, 40 (1983)). Accordingly, plaintiff's state law battery and wrongful death claims against the MTA for Gentile's conduct survive on a theory of *respondeat superior*.

that Breitkopf's police badge was not visible at the time of the shooting, Gentile would not be entitled to qualified immunity if plaintiff were able to establish that (1) no officer commanded Breitkopf to "drop your weapon" or gave him any other warning; (2) no NCPD officers struggled with Breitkopf; (3) Breitkopf's assault rifle was pointing downward the entire time; and (4) it was feasible for Gentile to give a warning to Breitkopf before shooting. In other words, if those facts are established, no officer of reasonable competence could believe that the use of deadly force was lawful. To grant qualified immunity because of the rapidity of the situation, because the facts in this case are not precisely the same as in previous excessive force cases, would "effectively wrench of all meaning the Supreme Court's admonition that 'officials can still be on notice that their conduct violates established law'" even in "novel" circumstances. *Torres v. City of Madera*, 648 F.3d 1119, 1129 (9th Cir. 2011) (citation omitted). In sum, there are disputed factual issues as to the circumstances surrounding Gentile's conduct that are relevant to the determination of whether it was objectively reasonable for Gentile to believe his use of deadly force was lawful, and those factual disputes preclude summary judgment on qualified immunity grounds.

Accordingly, Gentile's motion for summary judgment is denied.

### 2. Municipal Liability

Because the excessive force claim against Gentile survives, the Court next considers whether the MTA and the City can be held liable under Section 1983. Plaintiff alleges that the MTAPD officers did not receive "adequate training in recognizing and responding to situations potentially justifying the use of deadly force," or "in recognizing plainclothes police officers

present at police actions," especially officers from other jurisdictions.[22] (FAC ¶¶ 61, 70.) The MTA and the City move for summary judgment on the Section 1983 claims against them on the basis that plaintiff has failed to establish the existence of any municipal policy or custom that caused the alleged violation of Breitkopf's civil rights. For the following reasons, the Court grants summary judgment to the MTA and the City on the *Monell* claims.

#### a. Legal Standard

A municipal entity may be held liable under Section 1983 where the plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell*, 436 U.S. at 694 (emphasizing that the municipal policy must be the "moving force of the constitutional violation"). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco*

---

[22] In the FAC, plaintiff also asserts that the MTAPD provided its officers "with no or inadequate training concerning coordination with police departments and officers from overlapping jurisdictions" and "established no agreement or joint operating procedures or protocols with the [NCPD] concerning the joint activities or coordination . . . when MTA officers and Nassau County police officers jointly report to incidents in Nassau County." (FAC ¶¶ 78–79.) The MTA moves for summary judgment on this issue, arguing, *inter alia*, that plaintiff "offers no particulars as to what such training would consist of, or what the terms of an agreement covering 'joint activities' would provide," and that "the NCPD has no written or oral agreements" with any of the federal, state, and local level agencies that perform police duties within Nassau County. (MTA & Ramos Motion, at 22.) Plaintiff did not address this issue in her opposition. Accordingly, the Court deems these allegations abandoned and grants the MTA's motion with respect to these allegations. *See, e.g., Maher v. Alliance Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 267–68 (E.D.N.Y. 2009).

*v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). Instead, constitutional violations by government officials that are "persistent and widespread" can be "so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability." *Sorlucco*, 971 F.2d at 870–71 (citing *Monell*, 436 U.S. at 691) (internal quotation marks omitted). In addition, a policy, custom, or practice of the entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson*, 375 F.3d at 226 (quoting *Kern*, 93 F.3d at 44). A municipal entity, however, may be held liable only where the entity itself commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

"The failure to train or supervise [municipal] employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the [municipal] employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference exists where the plaintiff establishes that (1) "a policymaker knows 'to a moral certainty' that [municipal] employees will confront a particular situation"; (2) "the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult,' or 'there is a history of employees mishandling the situation'"; and (3) "the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 195–96 (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)); *see also Canton*, 489 U.S. at 390 (stating that municipal training is

actionable where, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need"). The plaintiff must show the "policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004)); *Ortiz v. Goord*, 276 F. App'x 97, 98 (2d Cir. 2008) ("Defendants may be held liable under § 1983 if they . . . exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution." (internal citation and quotation marks omitted)).

Recently, the Supreme Court reiterated that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). (quoting *Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). Thus, it is not enough to show an injury could have been avoided if an officer had certain or additional training. *Canton*, 489 U.S. at 390–91. This is because without actual or constructive "notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 131 S. Ct. at 1360. At the same time, however, the Court reaffirmed the viability, "in a narrow range of

circumstances," of the "single-incident" theory of liability envisioned in *Canton*. *See id.* at 1360–61; *Canton*, 489 U.S. at 390 n.10. Under that theory, a municipality can be found to be deliberately indifferent based on a single constitutional violation where "the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under [Section] 1983 without proof of a pre-existing pattern of violations."[23] *Connick*, 131 S. Ct. at 1361. The violation of constitutional rights must be a "highly predictable consequence" of the failure to train. *Id.* (internal quotation marks omitted). "Thus, deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash*, 654 F.3d at 334 (alterations and internal citations and quotation marks omitted).

b. Application to the MTA

The MTA argues that summary judgment on the *Monell* claim is appropriate because (1) the single incident theory of liability does not apply, and there is no evidence that the MTA never trained its officers on how to handle plainclothes officer confrontations; (2) the training at the NYPD Academy addressed the scale of force and use of deadly force, both in a classroom setting and during tactical, scenario-based training; (3) MTA officers adequately were taught how to resolve confrontations with plainclothes officers; (4) the MTA's policies are adequate and were reinforced to Gentile during yearly training; and (5) plaintiff cannot show that any deficient training caused Breitkopf's death. Plaintiff argues that she has proffered adequate evidence showing the MTA was deliberately indifferent, because (1) MTA supervisors knew officers could encounter plainclothes officers from other jurisdictions, and they acknowledged that such confrontations present officers with difficult decisions; (2) the Task Force Report demonstrates the high probability that a misidentification of an officer could result in serious injury; (3) before Breitkopf's death, not all officers received in-service plainclothes training, and the training at the MTA's firearms range encouraged them to shoot armed, unidentified individuals, rather than follow the procedures outlined in the MTAPD Manual; and (4) Gentile acted pursuant to the training he received.

As an initial matter, the record is bereft of evidence that, before March 2011, the MTA knew of a pattern or even one incident involving the misidentification of plainclothes officers and the use of deadly force by MTAPD employees, the RAND and Task Force Reports, or notice of any purported deficiencies with the NYPD Academy's and the MTA's training of its officers with respect to the use of deadly force and police-on-police confrontations. Further, it is uncontroverted that, before March 2011, the MTA trained its officers,

---

[23] In *Canton*, the Supreme Court hypothesized that a municipality's decision not to train police officers on the constitutional limitations on the use of deadly force "could properly be characterized as 'deliberate indifference' to constitutional rights" because the need for such training is "so obvious." 489 U.S. at 390 n.10. In *Connick*, the Court rejected municipal liability, reasoning that the risk that a prosecutor would commit a serious *Brady* violation was not "obvious," because "[i]n light of this regime of legal training and professional responsibility, recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." 131 S. Ct. at 1363. The Court also emphasized that "[t]he *Canton* hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force," leaving the officers with an "utter lack of ability to cope with constitutional situations." *Id.*

including Gentile, on the basic constitutional limitations on the use of deadly force and how to confront plainclothes officers. (*See, e.g.*, Gentile Dep. at 162–65 (discussing NYPD Academy), 166–67 (recognizing that "Police, don't move" command regards scenarios involving off-duty and uniformed officers and stating that he received training about such confrontations at the Academy and in yearly certifications from the MTAPD), 168–70 (explaining that in MTA's shooting training, "[the target] can flip to the front side or backside," and if "it flips to the front side, it will be a man with a gun," and "if it flips to the man displaying a gun, you do shoot that target," unlike when it flips to the rear side and the man has a shield), 180–81 (explaining that firearms training does not focus on necessity of deadly force, unlike other training), 180–88 (discussing plainclothes confrontation training).) Thus, because nothing suggests that the MTA condoned or ignored repeated constitutional violations, plaintiff must rely on a single-incident theory of liability.

As noted *supra*, a "'single incident is generally insufficient to demonstrate liability under [a failure to train theory].'" *Perez v. N.Y.C. Dep't of Corr.*, No. 10-CV-2697 RRM RML, 2013 WL 500448 (E.D.N.Y. Jan. 17, 2013) (quoting *Rubio v. Cnty. of Suffolk*, No. 01-CV-1806 (TCP), 2007 WL 2993833, at *8 (E.D.N.Y. Oct. 9, 2007), *aff'd*, 328 F. App'x 36 (2d Cir. 2009)); *see White-Ruiz v. City of New York*, No. 93CIV.7233(DLC)(MHD), 1996 WL 603983, at *10 (S.D.N.Y. Oct. 22, 1996) (denying summary judgment on failure to train or supervise claim because, *inter alia*, "[t]he [Mollen] Commission report and the testimony of former Commissioner Kelly provide sufficient evidence of the pervasiveness of police misconduct and retaliation against 'rats' and the sure knowledge of the Police Department regarding the need for better training in this

area"). Since *Connick*, some courts have concluded that a plaintiff cannot rely on the single-incident theory where she challenges the adequacy and not the lack of the existence of training. *See, e.g.*, *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 391–93 (S.D.N.Y. Dec. 10, 2013) (collecting cases denying summary judgment based on lack of any training, and dismissing claims challenging adequacy of training and denying motion to dismiss where plaintiff alleged no training); *Wereb v. Maui Cnty.*, 830 F. Supp. 2d 1026, 1031–34 (D. Haw. 2011) (analyzing *Connick*, concluding that the "single incident theory does not allow inquiry into subtleties of training," and denying summary judgment to defendant because there was evidence that county failed to train employees on how to monitor detainees and how to monitor for deprivation of serious medical needs); *O'Brien v. Barrows*, 556 F. App'x 2, 5 (2d Cir. 2014) [hereinafter *O'Brien II*] ("[T]he Court has suggested that failing to provide an armed police officer with *any* training about the constitutional limitations on the use of deadly force could constitute deliberate indifference." (emphasis in original)). Nothing in *Connick* or Second Circuit precedent, however, precludes a single-incident theory if the plaintiff can show that the training provided is tantamount to a lack of training because the municipal employees have an "utter lack of an ability to cope with constitutional situations," *Connick*, 131 S. Ct. at 1363, and "the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights," *Canton*, 489 U.S. at 390. *Accord Harvey v. Campbell Cnty.*, 453 F. App'x 557, 567 (6th Cir. 2011) ("'For liability to attach in the instance of a single violation, the record must show a complete failure to train the police force, training that is so reckless or grossly negligent that future

police misconduct is almost inevitable or would properly be characterized as substantially certain to result.'" (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982))). This Court applies that standard. As set forth below, even construing the evidence in the record most favorably to plaintiff, no rational jury could conclude that the standard for municipal liability, under a failure to train theory or any other theory, has been met.

MTAPD officers initially train at the NYPD Academy, and they receive ongoing training from the MTAPD on, among other topics, the constitutional limitations on the use of deadly force, plainclothes officer confrontations, and the corresponding written guidelines. Although plaintiff takes issue with the amount or format of the training provided to Gentile, that cannot establish deliberate indifference as a matter of law. *E.g.*, *Connick*, 131 S. Ct. at 1363–64 ("But showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability. '[P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct' will not suffice." (quoting *Canton*, 489 U.S. at 391) (brackets in original)); *id.* at 1363 ("[F]ailure-to-train liability is concerned with the substance of the training, not the particular instructional format. The statute does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States."). Plaintiff also does not identify any constitutional deficiencies in the written guidelines issued to Gentile by the NYPD or MTA, suggest how the procedure could or must be improved to better equip officers to handle plainclothes officer confrontations, or demonstrate how any such improvement could have helped avoid Breitkopf's death.

Even construing the record most favorably to plaintiff, no rational jury could find that the training provided was tantamount to a lack of training because the municipal employees have an "utter lack of an ability to cope with constitutional situations," *Connick*, 131 S. Ct. at 1363, nor could a rational jury find that "the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights," *Canton*, 489 U.S. at 390. The Second Circuit recently reached the same conclusion in rejecting a failure to train claim involving similar circumstances. *See O'Brien v. Barrows*, No. 1:10-cv-173-jgm, 2013 WL 486655, at *10 (D. Vt. Feb. 7, 2013) [hereinafter *O'Brien I*] ("The Plaintiff attempts to create a material dispute by alleging the officers merely read the policy at the in-service trainings, but do not receive classroom training or testing on it. In determining whether the Plaintiff has shown facts that arise to a patently obvious failure to train, this Court is unwilling to comb the SPD's training program with such a fine brush. The Supreme Court has specifically cautioned against engaging 'in an endless exercise of second-guessing municipal employee-training programs.'" (quoting *Canton*, 489 U.S. at 392)), *aff'd*, 556 F. App'x at 5 (reasoning that plaintiff's description "does not fully account for the training that the SPD provides to its officers," plaintiff identified no "authority for his argument that the SPD's method or quantity of training provided to its officers is insufficient," and "there was no indication that the SPD's training was inadequate given its nearly unblemished record with respect to allegations of excessive force").[24]

---

[24] Plaintiff's reliance on *Young v. Providence*, 404 F.3d 4 (1st Cir. 2005), is unpersuasive. In *Young*, two Providence police officers, responding to a call, shot and killed an off-duty Providence police officer attempting to respond to the same incident under the

Plaintiff also argues that Gentile was unequipped to handle a plainclothes officer confrontation properly because the inadequate scenario-based training did not

---

city's "always armed/always on-duty" policy that required him to act despite being off-duty and out of uniform. *Id.* at 9. The First Circuit first determined that a reasonable jury could find the shooting of the decedent unreasonable because the shooting officer "should have recognized [the decedent] as an off-duty officer (due to [the decedent's] demeanor and verbal commands) or not shot [the decedent] so rapidly without making sure of his identity." *Id.* at 27. The court then reasoned that a failure to train theory was viable because a jury could find that the officer's actions stemmed from the lack of training on on-duty/off-duty interactions, avoiding misidentification of off-duty officers, and other issues related to the always armed/always on-duty policy. *Id.* at 27. The court found that there were genuine disputes of material fact about the existence of *any* training as to these issues, and there was "some evidence from which a jury could find that it was common knowledge within the [police department] that misidentifications of off-duty officers responding to an incident often occurred in Providence." *Id.* at 28. The First Circuit also reasoned that, although there was no evidence of a prior friendly fire shooting, "[a] jury could conclude that the severity of the consequences of a friendly fire shooting forced the department to take notice of the high risk despite the rarity of such an incident" and provide particularized training on on-duty/off-duty interactions and misidentifications to lessen this risk, because departmental policy literally required officers to respond to incidents while off-duty and to always carry a firearm. *Id.* at 28–29.

Here, in contrast, it is uncontroverted that Gentile and other MTAPD officers were trained with respect to the use of deadly force and how to handle plainclothes officer confrontations, and there was no pattern of misidentifications. In addition, the misidentification did not involve off-duty officers or a policy similar to Providence's—the existence of which unquestionably affected the First Circuit's finding of increased risk. Therefore, *Young* is clearly distinguishable from the record in the instant case, and does not provide support for plaintiff's claim that the MTA was deliberately indifferent to the need to train properly its officers as to plainclothes officer confrontations and the use of deadly force, or that its training was constitutionally deficient.

ingrain in him the instinct to issue a verbal command to Breitkopf before using physical and deadly force. (MTA & Ramos Opp., at 23.) Plaintiff's attempt to use the drill during the firearms requalification to raise a genuine issue of fact on the adequacy of the training is entirely misplaced. As a threshold matter, although plaintiff argues this drill during the annual requalification is deficient because it does not allow for a verbal warning, no such conclusion could be drawn from the record. Specifically, plaintiff has pointed to no evidence that the gun is displayed during the flip drill in a manner that would make a warning feasible. In other words, if the target is pointing a gun at the officer when it flips, no warning would be feasible or necessary. Thus, plaintiff's speculation about this drill does not raise a genuine issue of material fact that precludes summary judgment.

In addition, it is uncontroverted that Gentile and Ramos were trained at the NYPD Academy and the in-service with the MTAPD on the constitutional limits on the use of deadly physical force, including that "[w]here feasible, and consistent with personal safety, a Member should identify him/herself as a police officer and give some warning prior to discharging a firearm in a deadly physical force situation." (MTAPD Manual, at 0169.) There is no testimony from any MTAPD member, or anyone else, that officers were instructed to disregard the guidelines in the MTAPD Manual, or that they believed the firearms requalification drill procedures trumped the guidelines in the MTAPD Manual. In fact, Gentile and Ramos testified that they received training on the need to use a warning where feasible, and knew it was the proper protocol. (*See* Gentile Dep. at 162–65, 176–77, 180–88; Ramos Dep. 142–43, 150, 152–53, 157–61.) In particular, Gentile acknowledged that he knew from his training that, where feasible, the challenging officer must give the

unidentified armed person the opportunity to identify herself and comply in order to help deescalate the situation in case the person is a plainclothes or off-duty police officer. Despite receiving such training, however, Gentile concluded it was not feasible on March 12, 2011. (*See* Gentile Dep. at 185 ("Q. If you could read the second thing [from the MTA Patrol Guide]. A. 'Two, identify yourself in a loud clear voice stating 'police, don't move.'[] Q. Did you ever identify yourself in a loud voice stating 'police, don't move'? A. I have before; not in this incident. There was no time . . . .").[25] Thus, even assuming *arguendo* that the firearms requalification drill and its "shoot/don't shoot" scenario were imperfect, that imperfection would not preclude summary judgment. *See Connick*, 131 S. Ct. at 1363–64. Plaintiff proffers no evidence from which a reasonable jury could conclude that Gentile relied on the firearms drill and disregarded his other training when he shot Breitkopf. Finally, contrary to the Second Circuit's instruction, plaintiff has presented no evidence tending to rule out those causes of the excessive force that would not support municipal liability, such as the negligent administration of a valid program or Gentile's negligent or intentional disregard of his training. *See Amnesty Am.*, 361 F.3d at 129–30 (citing *Canton*, 489 U.S. at 390–91) ("The elements of an identified training deficiency and a close causal relationship, which together require the plaintiffs to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor, ensure that a failure to train theory does not collapse into *respondeat superior* liability.").

---

[25] Gentile also testified that he did not fire immediately upon turning and seeing Breitkopf with a weapon, but rather only when he "saw the rifle start coming up." (Gentile Dep. at 111:24–25.)

Plaintiff also has failed to provide a single case where training comparable to the training provided to the MTAPD has been found to be constitutionally deficient. Other courts confronting a lack of evidence to support a failure to train claim involving friendly-fire incidents have reached a similar conclusion. *See, e.g.*, *Pickens*, 2006 WL 3175079, at *14–18 (granting summary judgment on failure to train claim where state law required off-duty officers to be "always on duty" but allowed rather than required them to carry a gun, law enforcement witnesses recognized risk of misidentification of off-duty or plainclothes officers who are armed and intervene in police actions, there was no "particularized" training module or unit devoted specifically to teaching uniformed on-duty officers to identify plainclothes officers in the field, officer had sixty hours of use-of-force training and some training in off-duty encounters and recognized risk of misidentification, and plaintiffs had not raised fact issue as to whether lack of "particularized" training would have avoided shooting, and there was no pattern of misidentification); *Ngo*, 2006 WL 1579873, at *9–11 (granting summary judgment on claim of deliberate indifference in failing to train officers in avoiding misidentification of plainclothes officers in the field because plaintiff had not identified "any specific training" that would have prevented shooter's mistaken perception that victim was the suspect-at-large, city provided some training on plainclothes officer identification, and there was no evidence that city had ignored pattern of misidentification).

In sum, even construing the evidence most favorably to plaintiff, no rational jury could find that Gentile had "the utter lack of an ability to cope with" the situation before him, *Connick*, 131 S. Ct. at 1363, and that this lack of ability caused Gentile to

misidentify Breitkopf and use excessive force. Accordingly, the Court concludes the MTA is entitled to summary judgment on the Section 1983 claim.[26] *Cf. Canton*, 489 U.S. at 391 ("And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.").[27]

### c. Application to the City

The City argues that summary judgment on the failure to train claim is appropriate because it cannot be held liable for the actions of MTA employees, the training the Academy provided to Gentile was adequate, and the City was not on notice of any purported deficiencies in the program when Gentile attended. As a threshold matter, other than addressing the issue regarding the adequacy, plaintiff did not address the City's other arguments in her opposition or at oral argument. Although the failure to address such arguments could be construed as abandonment of her § 1983 claim against the City, *see Maher*, 650 F. Supp. 2d at 267–68, the Court will address these arguments.

Plaintiff, meanwhile, now claims that the City should be held liable because it had a continuing common law and contractual duty to the MTA to apprise the MTA of the purported deficiencies in its training uncovered by RAND. Plaintiff also claims that Gentile's actions were not a superseding intervening cause, because they were a natural and foreseeable consequence of the allegedly inadequate training he received at the Academy. The City counters that this reformulation is inappropriate at this juncture and that plaintiff's claim sounds in tort and is procedurally barred. As set forth below, the Court agrees with the City.

### i. Municipal Liability for a Non-Employee's Actions

Under *Monell*, an employee of the defendant municipality generally must have committed the underlying constitutional violation. *See, e.g.*, *Henry-Lee*, 746 F. Supp. 2d at 567 ("[A] constitutional violation by a municipal employee is a necessary prerequisite to municipal liability under *Monell*."); *cf. Bd. of Cnty. Comm'rs*, 520 U.S. at 405 ("[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of *its* employee." (citing *Canton*, 489 U.S. at 391–92) (emphasis added)). In exceptional cases, a municipality may be held liable for the actions of a former officer or employee, *see Sassak v. City of Park Ridge*, 431 F. Supp. 2d 810, 815–17 (N.D. Ill. 2006), or an employee who also works for another municipality, *see Askew v. Bloemker*, 548 F.2d 673, 677–78 (7th Cir. 1976) (considering circumstances and concluding that city police officers assigned on full-time basis to federal agency were not acting under color of state law and could not be sued under § 1983), if the defendant "municipality's custom or policy [is] the moving force behind the [employee's] harm-

---

[26] Plaintiff does not elaborate on her claim that the MTA is liable because Gentile lacked training on the differences between New York City and Nassau County and did not know the NCPD has a BSO unit. (*See* MTA & Ramos Opp., at 23.) Her conclusory assertion does not raise a genuine issue of material fact as to whether the lack of such training proximately caused Breitkopf's death.

[27] For the same reasons, the Court grants summary judgment to the MTA to the extent the state law claims against it are for negligent training or supervision. *See Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010) ("To prevail on a [state law] claim for negligent hiring, training, supervision, or retention, a plaintiff must prove that a municipality's failure to properly train, hire, retain, or supervise 'its police officers in a relevant respect evidences a deliberate indifference to the rights of its inhabitants.'" (quoting *Jackson v. City of New York*, 596 N.Y.S.2d 457, 458 (N.Y. App. Div. 1993))).

causing conduct," *Sassak*, 431 F. Supp. 2d at 815; *see also Gibson v. City of Chicago*, 910 F.2d 1510, 1512–13, 1519–20 (7th Cir. 1990) (concluding that municipality was not entitled to summary judgment on *Monell* claim even though suspended officer placed on medical leave and declared unfit for duty did not shoot and kill neighbor under color of state law, because municipal liability depends on alleged municipal policies, and municipality had not attempted to recover officer's service revolver). A municipality that only trained and does not employ the constitutional wrongdoer, however, cannot be held liable for failure to train. *See Sassak*, 431 F. Supp. 2d at 815–17; *cf. Canton*, 489 U.S. at 389 ("Only where a municipality's failure to train *its* employees in a relevant respect evidences a 'deliberate indifference' to the rights of *its* inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." (emphasis added)); *Simms v. City of New York*, 480 F. App'x 627, 629 (2d Cir. 2012) ("A municipality may be held liable under § 1983 for *its* failure to train or adequately supervise *its* employees . . . ." (emphasis added)). The Court's research uncovered no cases holding that a municipality must continue to monitor or address a trainee's conduct in order to avoid Section 1983 liability, even though that trainee no longer works or never worked for the municipality and/or is under the control and supervision of another municipality.[28]

That responsibility lies with the employer.

For example, in *Sassak*, the plaintiffs alleged that Lake Zurich was liable under Section 1983 for its failure to train, supervise, and monitor police officers who committed wrongs, and that, instead of dismissing the officers, Lake Zurich hid information about their known unlawful and unconstitutional conduct and provided positive references to prospective employers. 431 F. Supp. 2d at 814–15. Lake Zurich argued it could not be held liable for failure to train because the defendant officer was employed by the City of Park Ridge when plaintiffs were injured, absolving Lake Zurich of any obligation to train, control, or discipline him. *Id.* at 815. The court agreed,

<hr>

[28] Relatedly, "[p]rivate individuals and entities are not normally liable for violations of rights secured by the United States Constitution. In order to maintain a claim based on alleged constitutional violations, a plaintiff must show that the actions complained of are 'fairly attributable' to the government"—that they are "taken under color of state law." *Archer v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 30 F. Supp. 2d 600, 604–05 (E.D.N.Y. 1998) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). Thus, plaintiff could not sue a private entity under Section 1983 if the MTA contracted with it to train the MTAPD recruits, absent evidence that the MTA was a "joint participant in the challenged activity" or ran the program itself. *See id.* Similarly, here, there is no evidence that the MTA and the City co-developed the curriculum at the Academy. The Court has found no case law to support the proposition that the City can be held liable for Gentile's alleged constitutional violation under a failure to train theory simply because the NYPD runs the Academy.

The City could, however, be liable to the MTA for contribution or indemnification, and to plaintiff, based on simple negligence. *See Sager v. City of Woodland Park*, 543 F. Supp. 282, 297–98 & n.20 (D. Colo. 1982) (denying summary judgment to third-party City of Colorado Springs where other municipality alleged that Colorado Springs, through its Training Academy, undertook obligation to train an officer and did so negligently, on grounds that (1) as a matter of law, the risks created by Colorado Springs' alleged failure to train properly its officers on shotgun-arrest technique are unreasonable, and it thus owes a duty to train properly that foreseeably extends to those wrongfully injured as proximate result of such improper training; (2) if officer killed decedent as a result of improper shotgun technique, act could have been foreseeable and does not break chain of causation; and (3) parties had not presented conclusive facts as to causation, and third-party plaintiff's own "grossly negligent" or "deliberately indifferent" acts might be superseding causes).

reasoning that "any link between Lake Zurich's failure to train and [the officer's] arrest of plaintiffs was severed by [the officer's] subsequent employment by Park Ridge." *Id.* at 816. It explained that the two are distinct municipalities, and "it cannot be said that the policies and customs of the former motivated plaintiff when he was employed by the latter." *Id.* According to the court, "Lake Zurich's failure to discipline and control its police officers could provide no incentives for [the defendant officer] to engage in illegal activity as a Park Ridge police officer," and "Lake Zurich could not ratify or condone [the officer's] arrest of plaintiffs." *Id.* The court also saw no direct causal "link between the failed policy and the ultimate harm," because "even if Lake Zurich adequately trained or disciplined its police officers, that training would not prevent an officer from committing acts of abuse when subsequently employed by another jurisdiction," unlike in *Gibson*, where, "had the defendant instituted an adequate weapon collection policy, and efficaciously applied it to the officer placed on medical leave, then the officer could not have used his service revolver to shoot his neighbor." *Id.* at 816–17.

This Court reaches the same conclusion under the facts of this case. Here, Gentile never worked for the NYPD, and he graduated from the Academy in 2006. Even assuming *arguendo* that there were deficiencies in the Academy's instruction, no rational jury could find a direct causal link between any such shortcomings and Breitkopf's death, because (1) the City had no control over Gentile and no responsibility to continue training him; (2) the MTAPD provides in-service training independent of the NYPD—training plaintiff claims taught Gentile to shoot first and ask questions later if he encounters an armed, plainclothes individual; and (3) as discussed *supra* (in connection with the Section 1983 claim

against the MTA), there is no evidence that the training was constitutionally defective or that any such defects caused Gentile's actions. Lastly, failure to train and failure to inform—plaintiff's theory of liability in her opposition brief—are distinct. The latter is based on negligence principles, and plaintiff has not demonstrated that the City's failure to inform the MTA of the RAND Report was grossly negligent, precluding suit under Section 1983. *See Felix-Torres v. Graham*, 687 F. Supp. 2d 38, 65 (N.D.N.Y. 2009) ("[W]hile 'ordinary negligence by itself could not establish a cause of action under Section 1983, repeated acts of negligence can be evidence of indifference' amounting to gross negligence." (quoting *Tylena M. v. Children's Servs.*, 390 F. Supp. 2d 296, 302 (S.D.N.Y. 2005))).

Accordingly, the Court grants the City's motion for summary judgment on the Section 1983 claim against it on this ground.

ii.     Negligence Claim

In her opposition, plaintiff claims the City negligently breached its "duty to apprise the MTA of the deficiencies in its recruit training which came to light as a result of the RAND Corp. review." (NYC Opp., at 10.) The City argues that this is improper because the allegations in the FAC did not give it adequate notice that plaintiff was pursuing a negligence claim based on failure to inform, and plaintiff never filed a notice of claim pursuant to GML §§ 50-e and 50-i. (NYC Reply, at 8–10.) At oral argument, plaintiff's counsel argued (1) the City had notice because the FAC mentions "pendent state law tort claims" (FAC ¶ 5); and (2) no notice of claim was necessary because the claim sounds in contract (*id.* ¶ 21). In her sur-reply, plaintiff argues that the City is liable to her for breaching its contractual obligation to properly train MTAPD candidates, because it (1) launched

a force or instrument of harm, and (2) "entirely displaced the MTA's obligation to properly train its officer candidates" through the contractual agreement. (NYC Sur-Reply, Docket No. 172, at 1–2.) Plaintiff also argues the City was on notice, because it admitted it had an agreement to train MTAPD candidates and pleaded, as an affirmative defense, that plaintiff may have failed to file a notice of claim. (*Id.* at 2.) Finally, plaintiff reiterates her belief that no notice of claim was required, because, "for purposes of the notice requirements of General Municipal Law § 50-e, the cause of action will only be found to sound in tort rather than in contract when the claim is entirely independent of the contractual relations between the parties." (*Id.* at 4.) According to plaintiff, because "the duty owed by the City of New York arises by virtue of contract, the claim is not subject to the notice requirements." (*Id.*)

As a threshold matter, plaintiff attempts to reformulate her theory of negligence liability again in the sur-reply. In her opposition, plaintiff asserts a "failure to inform" theory. In the sur-reply, she shifts again to a failure to train theory. It is impermissible to vary the claim from filing to filing in order to avoid summary judgment.[29] Regardless, even assuming

---

[29] "[A]t a minimum," a complaint must provide "notice of the nature of the claim against [the defendant], including which of its actions gave rise to the claims upon which the complaint is based," so as to permit the defendant to "commence discovery" and prepare a defense. *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 32 (2d Cir. 2006). The FAC alleges failure to train, not that the City failed to inform the MTA of deficiencies in the Academy's training. (*See* FAC ¶¶ 73–77.) Therefore, plaintiff's mention of "pendent state law claims" and an agreement with the MTA could not have put the City on notice that its alleged failure to inform "gave rise to the claims upon which the complaint is based." *E & L Consulting*, 472 F.3d at 32.

*arguendo* that the City was on notice, the Court concludes that summary judgment is warranted because plaintiff failed to file a notice of claim pursuant to GML §§ 50-e and 50-i.

Plaintiff does not dispute that a notice of claim is necessary for a personal injury claim against the City or that her failure to file a timely notice of claim would justify the dismissal of any negligence action against the City (or make any amendment at this juncture futile). *See, e.g.*, *Crippen v. Town of Hempstead*, No. 07-CV-3478 (JFB)(ARL), 2009 WL 803117, at *15–18 (E.D.N.Y. Mar. 25, 2009) (addressing notice of claim requirement). Instead, plaintiff argues that no notice of claim was required because her claim sounds in contract.

A notice of claim under GML § 50-e is unnecessary when alleging fraud and breach of contract against a municipality, and so the need to file a notice of claim before suing a public corporation depends on whether the essence of the claim sounds in contract or tort. *Guinyard v. City of New York*, 800 F. Supp. 1083, 1090 (E.D.N.Y. 1992); *Everston v. State of N.Y. Mortg. Agency*, No. 89 Civ. 7474 (RJW), 1992 WL 6190, at *8 (S.D.N.Y. Jan. 3, 1992) (citing *Hoydal v. City of New York*, 545 N.Y.S.2d 823, 824 (N.Y. App. Div. 1989)). However, although a party outside a contract may "sue for tort damages arising out of negligently performed or omitted contractual duties," *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 586 (1994), no authority holds that such a claim "sounds in contract," or that no notice of claim is required for a tort claim related to a contract or a duty arising from a contract, or a tort claim arising from the same allegedly wrongful

conduct underlying a contract claim.[30]

*Palka* and *Espinal v. Melville Snow Contractors*, 98 N.Y.2d 136 (2002), support this conclusion. In *Espinal*, the Court of Appeals considered whether a duty of care ran from the defendant to the plaintiff, who slipped and fell in a parking lot owned by her employer, based on the defendant's snow removal contract with the employer. 98 N.Y.2d at 138. The Court of Appeals did not hold that the defendant was liable to plaintiff in contract or that the claim "sounded in contract." Instead, the court explained that "a contractual obligation, standing alone, will generally not give rise to tort liability in favor of a third party," because that "could render the contracting parties liable in tort to an indefinite number of potential beneficiaries." *Id.* at 138–39 (internal quotation marks omitted). It held that "a party who enters into a contract to render services may be said to have assumed a duty of care—and thus be potentially liable *in tort*—to third persons" where (1) "the contracting party, in failing to exercise reasonable care in the performance of his duties, launches a force or instrument of harm"; (2) "the plaintiff detrimentally relies on the continued performance of the contracting party's duties"; and (3) "the contracting party has entirely displaced the other party's duty to maintain the premises safely." *Id.* at 140 (internal quotation marks, brackets, and citations omitted) (emphasis added); *see also Palka*, 83 N.Y.2d at 589 ("This record supports the conclusion that Servicemaster undertook a duty and breached the duty to inspect and manage the repair of wall-mounted fans. Nurse Palka was injured as a result of Servicemaster's negligent performance or nonperformance of that tort duty arising out of its extensive, exclusive maintenance contract."). Plaintiff's claim, which is for personal injury damages and not damages contemplated between the contracting parties, undoubtedly falls under the first *Espinal* category. *Cf. Electrocraft Ark., Inc. v. Super Electric Motors, Ltd.*, No. 4:09cv00318 SWW, 2009 WL 5181854, at *6 (E.D. Ark. Dec. 23, 2009) (explaining, under Arkansas law, that the right sued upon is contractual if based on breach of contract, and tortious if based on breach of a non-contractual duty; that damages prayed for are a factor in determining whether an action sounds in contract or tort; and that, "[i]n tort cases, the purpose of the law to compensate the plaintiff for the injury inflicted even though it may have been unexpected, but in contract cases the special damages must have been in contemplation of the parties

---

[30] The cases addressing whether a claim based on breach of contract sounds in contract or tort do not involve third-party beneficiaries. Instead, they focus on whether the claim involves the "breach of a duty extraneous to, or distinct from, the contract between the parties." *Hoydal*, 545 N.Y.S.2d at 824–25; *see Avazpour Networking Servs., Inc. v. Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 361 (E.D.N.Y. 2013) ("[E]ven in the absence of personal injury, New York courts recognize a claim in tort under circumstances where a party to a contract can properly allege the breach of a duty owed to the plaintiff, that exists separate and apart from the contract."); *Everston*, 1992 WL 6190, at *8 (holding that claim sounded in contract because allegedly breached duties were same duties arising from contract plaintiff claimed existed between him and defendant); *N. Shore Bottling Co. v. Schmidt & Sons*, 22 N.Y.2d 171, 179 (1968) ("[A] contracting party may be charged with a separate tort liability arising from a breach of a duty distinct from, or in addition to, the breach of contract."). Plaintiff does not establish that she and Breitkopf were parties to the contract between the City and MTA or that, as a matter of law, they can sue for breach of contract to "obtain the benefit of their bargain," *Avazpour*, 937 F. Supp. 2d at 362; *see Hoydal*, 545 N.Y.S.2d at 824–25 ("Since this cause of action does not allege a breach of duty extraneous to, or distinct from, the contract between the parties, the plaintiffs' theory of recovery is necessarily limited to a suit to recover damages for breach of contract."), rather than sue in tort as third-party beneficiaries.

when the agreement was made").

Accordingly, because plaintiff's claim sounds in tort and she failed to file a notice of claim, the Court grants summary judgment to the City on the negligence claim on this ground.[31]

## B. GML § 205-e Claims

Plaintiff's state law claims against the individual defendants under GML § 205-e are premised on alleged violations of the New York Penal Law. For the following reasons, the Court concludes that none of the § 205-e claims survive summary judgment, with the exception of the claim against Cafarella based upon his alleged violation of New York Penal Law § 190.25(3).

### 1. Legal Standard

At common law, the "firefighter's rule" employed in New York barred firefighters and police officers "from recovering for injuries caused by 'negligence in the very situations that create the occasion for their services.'" *Madonna v. Am. Airlines, Inc.*, 82 F.3d 59, 61 (2d Cir. 1996) (quoting *Santangelo v. State*, 71 N.Y.2d 393, 397 (1988)); *see also Giuffrida v. Citibank Corp.*, 100 N.Y.2d 72, 76–79 (2003). Thus,

police and firefighters could not recover in common law negligence for line of duty injuries resulting from risks associated with the particular dangers inherent in that type of employment. *Gammons v. City of New York*, 972 N.Y.S.2d 559, 562 (N.Y. App. Div. 2013) (quoting *Wadler v. City of New York*, 14 N.Y.3d 192, 194 (2010)).

The New York State Legislature has on several occasions "sought to ameliorate the harsh effects of the firefighter's rule." *Giuffrida*, 100 N.Y.2d at 77. First, the rule now is applicable only in actions against a "police officer's or firefighter's employer or co-employee." N.Y. Gen. Obl. Law § 11-106(1). Second, GML § 205-a (as to firefighters) and GML § 205-e (as to police officers) establish a cause of action where an officer is injured by any person's failure "to comply with the requirements of any of the statutes, ordinances, rules, orders and requirements of the federal, state, county, village, town or city governments or of any and all their departments, divisions and bureaus." *Gammons*, 972 N.Y.S.2d at 564; *see* N.Y. Gen. Mun. Law § 205-e(1). Although the language of the statute "is expansive, the [New York] Court of Appeals has explained that 'the statute cannot reasonably be applied literally in accordance with its broad language.'" 972 N.Y.S.2d at 564 (quoting *Galapo v. City of New York*, 95 N.Y.2d 568, 574 (2000)). Consequently, as a prerequisite to recovery under § 205-e, "a police officer must demonstrate injury resulting from negligent noncompliance with a requirement found in a well-developed body of law and regulation that imposes clear duties." *Galapo*, 95 N.Y.2d at 574 (internal quotation marks omitted); *see also Williams v. City of New York*, 2 N.Y.3d 352, 363 (2004).

To establish a claim under GML § 205-e, the plaintiff must "(1) identify the statute or ordinance with which the defendant failed

---

[31] In any event, even assuming no notice of claim was required, for the reasons already discussed in connection with the § 1983 claims, plaintiff has failed to create a genuine issue of material fact as to whether any alleged negligence in failing to advise the MTA of the RAND Report caused Gentile's actions. To the contrary, as noted *supra*, Gentile received adequate training and acknowledged that training in his deposition. Thus, any evidence of causation is completely lacking, and summary judgment is warranted on this independent basis as well. In short, there is insufficient evidence for a negligence claim to survive summary judgment against the City regardless of the plaintiff's theory (including negligent training or negligent supervision or negligent failure to inform).

to comply, (2) describe the manner in which the [firefighter or police officer] was injured, and (3) set forth those facts from which it may be inferred that the defendant's negligence directly or indirectly caused the harm." *Gammons*, 972 N.Y.S.2d at 564; *see also Madonna*, 82 F.3d at 62. In *Giuffrida*, the New York Court of Appeals discussed the causation element, establishing that to make out a claim under GML §§ 205-a and 205-e, "a plaintiff is not required to show the same degree of proximate cause as is required in a common-law negligence action." 100 N.Y.2d at 81. "Rather, the substantial case law that has developed on the subject holds that a plaintiff need only establish a practical or reasonable connection between the statutory or regulatory violation and the claimed injury." *Id.* (internal quotation marks and citation omitted); *see also Zanghi v. Niagara Frontier Transp. Comm'n*, 85 N.Y.2d 423, 441 (1995).

In this case, plaintiff premises her claims on violations of the New York Penal Law. A Section 205-e "claim may be predicated on a violation of those Penal Law sections that prohibit specific acts." *Williams*, 2 N.Y.3d at 365. The claim may not "be premised solely on a violation of the justification defenses found in the Penal Law or the Criminal Procedure Law." *Id.* Further, where no criminal charges were brought against the defendant, "a rebuttable presumption exists that the Penal Law has not been violated." *Id.* at 366. Thus, "a defendant who has not been charged with a crime is entitled to summary judgment on a section 205-e claim predicated on the Penal Law where a reasonable view of the evidence supports the conclusion either that no prohibited conduct took place, or that a justification defense exists." *Id.* To defeat the motion, the "plaintiff must come forward with compelling evidence demonstrating a material question of fact as to whether the conduct was criminal and not justified." *Id.* at 366–67.[32]

### 2. Penal Law § 195.05: Obstructing Governmental Administration

Plaintiff alleges that Ramos, Gentile, and Cafarella are liable based on their violation of N.Y. Penal Law § 195.05. Section 195.05 provides, in relevant part, that "[a] person is guilty of obstructing governmental administration when he intentionally . . . prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act."

To be guilty, the defendant must intend to prevent the public servant from lawfully engaging in a specific official function. *Dicker v. Campus*, 981 F. Supp. 851, 858 n.3 (S.D.N.Y. 1997); *see People v. Beam*, 866 N.Y.S.2d 564, 567 (N.Y. Crim. Ct. 2008) ("Activities such as refusing to obey orders, physically resisting arrest, interfering with the arrest of another, or assaulting a

---

[32] In *Williams*, the Court of Appeals explained that the plaintiff's burden was "further complicated by the fact that" the defendant officers were acting in the line of duty when the decedent was killed, and they "contend[ed] that they employed the force necessary to defend themselves against what they reasonably believed to be the use or imminent use of deadly physical force." 2 N.Y.3d at 366. The court acknowledged that Penal Law § 35.30 "requires a trier of fact to 'second-guess an officer's split-second weighing of choices,'" but it reasoned that the fact that Section 205-e liability is based on violation of a law that imposes "clear duties" "cautions against predicating a section 205-e claim on *alleged* Penal Law violations that implicate the justification defense." *Id.* (emphasis in original). Thus, although the court held that a conviction is not necessary for § 205-e liability, "because the provisions that plaintiff claims were violated require proof beyond a reasonable doubt and even then, otherwise criminal conduct is excused if justified, [the plaintiff's] burden is substantial in the absence of a conviction." *Id.*

police officer are all typical acts that are properly charged as obstructing governmental administration. The commonality in these offenses is an intentional insertion of one's self or one's intentions into steps taken by police officers to fulfill their duties." (internal citations omitted)); *People v. Ferreira*, 807 N.Y.S.2d 832, 834 (N.Y. Crim. Ct. 2005) ("Although criminal responsibility may attach to minimal interference set in motion to frustrate police activity, it does so only where a person intentionally impedes or defeats a governmental function by means of physical force or interference or by means of some independently unlawful act." (internal quotation marks and citations omitted)). In addition, "purely verbal interference may not satisfy the 'physical component under Penal Law § 195.05.'" *In re Davan L.*, 91 N.Y.2d 88, 91 (1997) (citing *People v. Case*, 42 N.Y.2d 98, 102 (1977)). Instead, the interference must be physical in nature at least in part. *Id.* Interrelated conduct— "actions coupled with words" or conduct causing some "physical reaction and dispersal"—is actionable. *Id.* at 91–92; *see Wood v. Town of E. Hampton*, Civil Action No. 08-CV-4197, 2010 WL 3924847, at *11–12 (E.D.N.Y. Sept. 30, 2010); *In re Davan*, 91 N.Y.2d at 91–92 (finding probable cause to arrest teenager for obstruction, where he was specifically warned by officer about narcotics operation but still rode bicycle towards known criminal activity to warn potential targets of police presence, causing "a physical reaction and dispersal" of the targets).

There is no evidence from which a reasonable jury could find that, under the circumstances, Ramos, Gentile, and Cafarella intended to obstruct governmental administration. The uncontroverted testimony establishes that defendants wanted to help the NCPD address the situation with Anthony, which does not implicate the considerations in *Beam* and is distinguishable from the conduct in *Davan*. Further, no reasonable jury could conclude that defendants intended to prevent Breitkopf from performing his duties. That the effect of their actions obstructed Breitkopf does not mean they intended to obstruct his performance of his duties.

Accordingly, even construing the evidence most favorably to plaintiff, because she has failed to come forward with any evidence demonstrating a material question of fact as to whether the conduct was criminal under Section 195.05 and not justified, *Williams*, 2 N.Y.3d at 367, the Court grants summary judgment to Gentile, Ramos, and Cafarella on the N.Y. Penal Law § 195.05-based GML § 205-e claims.

### 3. Penal Law § 190.25: Criminal Impersonation in the Second Degree

Plaintiff alleges that Cafarella also is liable based on his violation of N.Y. Penal Law § 190.25(3), which prohibits criminal impersonation in the second degree:

> A person is guilty of criminal impersonation in the second degree when he . . . (a) [p]retends to be a public servant, or wears or displays without authority any uniform, badge, insignia or facsimile thereof by which such public servant is lawfully distinguished, or falsely expresses by his words or actions that he is a public servant or is acting with approval or authority of a public agency or department; and (b) so acts with intent to induce another to submit to such pretended official authority, to solicit funds or to otherwise cause another to act in reliance upon that pretense.

N.Y. Penal Law § 190.25(3). Cafarella argues that the claim has no merit because

the statute requires him to assume the identity of a real person and have "intent to derive a personal benefit" or "making someone submit to pretended authority." (Cafarella Motion, at 12, 14.) He also claims his actions did not cause Breitkopf's death.

First, by its plain language, subsection (3) does not require the defendant to assume the identity of a real person, unlike subsection (1), which requires impersonation of "another . . . with intent to obtain a benefit or to injure or defraud another." N.Y. Penal Law § 190.25(1); *see, e.g.*, *People v. Sadiq*, 654 N.Y.S.2d 35, 36 (N.Y. App. Div. 1997). Because subsection (3) requires "intent to induce another to submit to such pretended authority . . . or to otherwise cause another to act in reliance upon that pretense," actual submission to the pretended authority, reliance upon that pretense, and intent to derive a personal benefit are unnecessary. *Contra People v. Karp*, 365 N.Y.S.2d 414, 416 (N.Y. Crim. Ct. 1975) (holding that actual submission to pretended authority is necessary). Thus, to the extent that Cafarella argues that he must be impersonating a real person or must intend to derive a personal benefit in order to be liable, the Court disagrees.

Second, the Court recognizes that no court has considered a similar case—where a retired police officer interjects herself into an active police operation with the desire to assist. Courts generally have dealt with incidents involving false representations or desires to obtain a benefit. *See, e.g.*, *Barcomb v. Sabo*, No. 8:07-cv-877(GLS/DRH), 2011 WL 1770795, at *12 (N.D.N.Y. May 9, 2011) (holding that officer was entitled to qualified immunity from false arrest and malicious prosecution claims because officers of reasonable competence could disagree as to whether plaintiff's statement that he had been a cop for six years, in light of his suspension from

the force at that time, was proscribed under Penal Law § 190.25(3), and officer had reasonable basis to conclude that plaintiff attempted to use his status to gain favorable treatment at a sobriety checkpoint); *People v. Jackson*, No. 2011-2 S CR, 975 N.Y.S.2d 368, at *1–2 (N.Y. App. Div. Dec. 24, 2012) (concluding, *inter alia*, that evidence at trial was factually and legally sufficient to establish intent element because defendant admitted he made statement in question with intent to induce officer to leave him alone); *People v. Diamond*, 353 N.Y.S.2d 688, 690 (N.Y. Crim. Ct. 1974) (denying motion to dismiss impersonation charge because there was evidence that defendant "sought to obtain the benefit of avoiding arrest and its possible consequences by impersonating a transit authority conductor and displaying a conductor's badge"); *cf. DePrima v. Vill. of Catskill*, 105 F. Supp. 2d 75, 81–82 (E.D.N.Y. 2000) (denying defendants' summary judgment motion on false arrest, false imprisonment, and malicious prosecution claims because there was a genuine issue of material fact regarding whether probable cause existed to arrest the plaintiff for impersonating an officer where, at the time of his arrest, plaintiff's badge "clearly indicated" he was the past chief of police, which was true, and he did not attempt to use the badge to obtain favorable treatment, nor attempt to act as an officer). In addition, a public servant employed by one public agency or department can commit the crime of criminal impersonation by falsely implying that she is acting with the approval or authority with another such agency or department. *See People v. Martinez*, 602 N.Y.S.2d 217, 218 (N.Y. App. Div. 1993) (upholding conviction of criminal impersonation in first degree because evidence established that defendant New York City Corrections Officer robbed man after stopping him by displaying a police officer's shield). Notwithstanding the

absence of case authority addressing the claim here, there is no reason that, under the appropriate factual circumstances, such a claim could not be brought against a retired officer who pretends to be acting as a police officer and induces another to act upon such pretended authority. As set forth below, the Court concludes that plaintiff has submitted sufficient evidence to create a genuine issue of fact that precludes summary judgment on this GML § 205-e claim based upon an alleged violation of Penal Law § 190.25(e).

Plaintiff has submitted several pieces of evidence to support her claim that Cafarella created the false impression at the scene that he was acting with the approval or authority of the NCPD, and caused others (including Ramos and Gentile) to rely upon that pretense. First, plaintiff points to evidence that Cafarella initially intervened when Lewis was confronting Anthony, as Anthony held the knife and Cafarella made certain commands to him. (Lewis Dep. at 29–31.) Second, plaintiff points to evidence that Cafarella, after calling 911, stayed at the scene and continued to give directions to others. For example, plaintiff points to evidence that Cafarella gave some instruction to police officers about checking another individual who exited the side door of the DiGeronimo house. (Cafarella Dep. at 49, 65–66.) In addition, plaintiff points to the testimony of Theresa Kelly that Cafarella directed her to "get the f*** out of here" on three separate occasions and kicked her car door. (Deposition of Theresa Kelly ("Kelly Dep.") at 13, Cafarella Opp. Ex. E.) Kelly further testified that Cafarella was "ordering everyone around," "causing a lot of confusion," and that "everybody seemed to be listening to him." (Kelly Dep. at 13–15.) She testified that she was under the impression he was a detective, in plainclothes. (*Id.* at 23.) Plaintiff also points to evidence that Cafarella called out "gun" when he saw Breitkopf carrying an assault weapon. (Cafarella Dep. at 108–10.) In fact, Ramos recalled the statement not in the form of an announcement, but rather in the form of a command: "Drop your weapon, drop your weapon." (Ramos Dep. at 77, 81–82.) In short, the Court concludes that plaintiff has presented compelling evidence that creates a genuine issue of fact as to whether Cafarella, by his words and actions, induced others—specifically, Ramos, Gentile, and Breitkopf—to believe he was a police officer, or acted with police authority and approval, in order to induce individuals at the scene to submit to that pretended authority, in violation of Section 190.25(3).

The Court finds Cafarella's arguments for summary judgment unpersuasive. In particular, Cafarella argues this claim cannot proceed because it is uncontroverted that he told NCPD officers he was "retired from the force." (Pl. Cafarella Counterstatement ¶ 2.) Similarly, both Gentile and Ramos testified that Cafarella was not displaying a shield and that they knew he was a *retired* police officer. (Gentile Dep. at 55, 64, 72; Ramos Dep. at 49, 58, 71.) Thus, Cafarella argues that any statements by him cannot, as a matter of law, implicate Penal Law § 190.25(3). However, that argument fails to recognize that, when Cafarella yelled "gun" or "drop your weapon" or words to that effect, neither Gentile nor Ramos knew precisely who had uttered that statement. Gentile testified that he heard an announcement of a "gun" or "weapon" and at the same time and saw NCPD with a look of alarm. (Gentile Tr. at 98–104.) Ramos testified that, given the circumstances, he presumed it was an officer. (*See* Ramos Tr. at 77 ("As I was looking at the front of the house for no particular reason, I overheard what I assumed to be a Nassau County Police Officer challenge somebody saying 'drop your weapon, drop your weapon.'").) In short, if the evidence is construed most favorably to plaintiff, a rational jury could

conclude that, at that moment, Cafarella was trying to induce Breitkopf and/or other police officers to act on his pretended official or approved authority, and induced Ramos and Cafarella to act on that pretended authority. Moreover, the evidence also creates a material dispute of fact as to whether there is a practical or reasonable connection between the alleged violation of Section 195.25(3) (which includes Cafarella's alleged statement regarding the "gun" or "weapon") and the shooting of Breitkopf. Although Cafarella points to the fact that Gentile did not fire immediately upon hearing the statement, the causation issue must be resolved by the jury under the particular facts of this case.

Accordingly, the Court denies summary judgment to Cafarella on the N.Y. Penal Law § 195.25(3)-based GML § 205-e claim.

### 4.  Penal Law Claims against the DiGeronimos

Plaintiff alleges that the DiGeronimos are liable under GML § 205-e based on their violation of N.Y. Penal Law §§ 265.01 (criminal possession of a weapon in the fourth degree), 105.00 (conspiracy in the sixth degree), and 20.00 (aiding and abetting). Section 265.01 provides, in relevant part, that a person is guilty of criminal possession of a weapon in the fourth degree when (1) she "possesses any firearm, electronic dart gun, electronic stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or 'Kung Fu star'"; or (2) she possesses any dagger, dangerous knife, dirk, razor, stiletto, imitation pistol, or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another." N.Y. Penal

Law § 265.01(1)–(2). Plaintiff relies on Anthony's possession of a "metal knuckle knife" under subsection (1), and "a dangerous knife" under subsection (2).

With respect to subsection (1), as explained *supra*, no rational jury could conclude that Anthony was carrying the Interceptor on March 12, 2011, because there is no evidence to support that contention. Therefore, although an Interceptor could qualify as a "metal knuckle knife" under subsection (1), that knife had absolutely no connection to Anthony's or the police's actions on that date. In any event, even assuming *arguendo* Anthony possessed the Interceptor on his person on March 12, any claim against the DiGeronimos under subsection (1) must fail for the same reasons a claim under subsection (2) must fail (as discussed *infra*)—namely, there is no evidence that the DiGeronimos possessed any of those weapons on March 12 (or had the intent required by the statute), or that any of Anthony's weapons had any practical or reasonable connection to Breitkopf's death.

With respect to subsection (2), a knife may be considered a "dangerous knife," within the meaning of that subsection, when the circumstances of its possession, including the behavior of its possessor, demonstrate that the possessor herself considered it a weapon, even if the knife might not otherwise be defined as a "dangerous knife" by reason of its inherent characteristics. *In re Michael Grudge M.*, 915 N.Y.S.2d 286, 287–88 (N.Y. App. Div. 2011) (citing *In re Matter of Jamie D.*, 59 N.Y.2d 589, 591–93 (1983); *In re Sean R.*, 824 N.Y.S.2d 302, 304 (N.Y. App. Div. 2006)) (concluding that appellant's aggressive behavior, specific threat of physical injury he allegedly made against complainant, and fact that he appeared to be about to reach for weapon, demonstrated

that appellant considered knife on him to be a weapon and thus a "dangerous knife"); *see People v. Laramore*, 764 N.Y.S.2d 299, 299 (N.Y. App. Div. 2003) (explaining that "'intent to use unlawfully against another' . . . may be inferred from the act itself, or from the defendant's conduct or the surrounding circumstances.'" (internal quotation marks omitted)). New York Penal Law § 265.15(4) provides that possession of a "dangerous knife" is presumptive evidence of intent to use the knife unlawfully against another. *Accord Sean R.*, 824 N.Y.S.2d at 304. Thus, for example, where "the instrument in question [is] not a weapon per se, but a kitchen knife, the presumption of unlawful intent by virtue of the mere possession of the instrument [such as in Penal Law § 265.15(4)] does not apply." *Laramore*, 764 N.Y.S.2d at 299. "[T]he key inquiry is the manner in which the kitchen knife is used." *Levy v. City of New York*, 935 F. Supp. 2d 575, 586 (E.D.N.Y. 2013).

Even construing the facts most favorably to plaintiff, no rational jury could find the DiGeronimos liable for violating Penal Law § 265.01(2). Although plaintiff claims the DiGeronimos directly violated the statute, there is no evidence that they possessed a "dangerous knife" on March 12. Anthony's actions precipitated the police activity. For substantially similar reasons, the DiGeronimos could not be criminally liable for Anthony's conduct pursuant to (1) Penal Law § 20.00, which requires that the accomplice act "with the mental culpability required for the commission" of the crime;[33] or (2) Penal Law § 105.00, which provides that a "person is guilty of conspiracy in the

sixth degree when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct." There is no evidence of an agreement between the DiGeronimos and Anthony. Moreover, a finding of a "dangerous" knife depends on the "circumstances of its possession." *Michael Grudge*, 915 N.Y.S.2d at 287. Even construed most favorably to plaintiff, there is no evidence that Anthony or the DiGeronimos considered the knife Anthony possessed inherently a weapon or a "dangerous knife," that the DiGeronimos gave Anthony the knife for that reason or to facilitate the commission of a crime, or that the DiGeronimos did not stop Anthony from leaving home despite knowing that he potentially could use the knife in an unlawful manner. Therefore, summary judgment to the DiGeronimos is warranted because plaintiff fails to raise a genuine issue of material fact as to the possession of a "dangerous knife" or the "intent" elements in the Penal Law statutes.

Finally, even assuming *arguendo* that the DiGeronimos violated the Penal Law, plaintiff fails to demonstrate a genuine issue of fact as to any "practical or reasonable connection" between any violation and Breitkopf's death. Plaintiff argues that there is a reasonable connection because, without these acts, Breitkopf would not have responded to the DiGeronimos' residence. (DiGeronimo Opp., at 12–13.) Plaintiff's theory eviscerates any notion of a limit to liability based on causation. Despite the temporal proximity, Anthony was killed before Breitkopf arrived, numerous NCPD officers were present and addressing the situation, and the DiGeronimos had no control over any officer's response or the police procedures utilized. Plaintiff cites to no case holding that a civilian (including a landlord) may be held liable under GML § 205-e for harm to police officers based on

---

[33] Under New York law, the culpable mental states are "intentionally," "knowingly," "recklessly," or with "criminal negligence," N.Y. Penal Law § 15.05; and with "depraved indifference to human life," *see generally People v. Feingold*, 7 N.Y.3d 288 (2006).

circumstances wholly outside the civilians' control and of which they had no notice. Instead, under New York law, liability in analogous situations must be premised on notice and foreseeability to the third party. *See generally Ishmail v. ATM Three, LLC*, 909 N.Y.S.2d 540, 542 (N.Y. App. Div. 2010) (explaining that landowner has no duty reasonably to protect those using her premises from harm not caused by a third party's foreseeable criminal conduct on the premises); *Gover v. Mastic Beach Prop. Owners Ass'n*, 869 N.Y.S.2d 593, 594 (N.Y. App. Div. 2008) ("Liability can be imposed upon a landowner or a lessee who creates a defective condition on the property, or had actual or constructive notice of the allegedly defective condition."). Here, no rational jury could conclude that the events that transpired with respect to the shooting of Breitkopf, after Anthony's death, were foreseeable to the DiGeronimos or had any practical or reasonable connection to the possession of weapons by Anthony.

Accordingly, the Court grants summary judgment to the DiGeronimos on the N.Y. Penal Law §§ 265.01-, 105.00-, and 20.00-based GML § 205-e claim.

## C. Negligence Claims against Cafarella and the DiGeronimos

Plaintiff also brings common law negligence claims against Cafarella and the DiGeronimos. She contends that Cafarella is liable because, through his involvement at the scene, he assumed a duty of reasonable care that extended to Breitkopf and breached that duty when he challenged Breitkopf's presence, proximately causing Breitkopf's death. Plaintiff claims the DiGeronimos are liable for negligently entrusting Anthony with a dangerous instrumentality and for breaching their duty to protect the NCPD officers on their property from the foreseeable harm from Anthony and the risk

that responding officers could be killed in a "friendly fire" exchange. For the following reasons, only the negligence claim against Cafarella survives summary judgment.[34]

### 1. Legal Standard

"Negligence is conduct that falls beneath the standard of care which would be exercised by a reasonably prudent person in similar circumstances at the time of the conduct at issue." *Harper v. United States*, 949 F. Supp. 130, 132 (E.D.N.Y. 1996). Under New York law, a plaintiff must establish the following elements to prove negligence: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) the plaintiff was damaged. *E.g.*, *Van Nostrand v. Froehlich*, 844 N.Y.S.2d 293, 293 (N.Y. App. Div. 2007); *Luina v. Katharine Gibbs Sch. N.Y., Inc.*, 830 N.Y.S.2d 263, 263 (N.Y. App. Div. 2007); *Talbot v. N.Y. Inst. of Tech.*, 639 N.Y.S.2d 135, 135 (N.Y. App. Div. 1996).

New York General Obligations Law Section 11-106 permits officers injured in the line of duty to recover damages from the person or entity whose negligence caused the injury. Section 11-106(1) provides:

> In addition to any other right of action or recovery otherwise available under law, whenever any police officer or firefighter suffers any injury, disease or death while in the lawful discharge of his official duties and that injury, disease or death is proximately caused by the neglect, willful omission, or intentional, willful or culpable

---

[34] The negligence determination is also determinative of plaintiff's wrongful death claims. *See Eberts*, 861 N.Y.S.2d at 732.

conduct of any person or entity, other than that police officer's or firefighter's employer or co-employee, the police officer or firefighter suffering that injury or disease . . . may seek recovery and damages from the person or entity whose neglect, willful omission, or intentional, willful or culpable conduct resulted in that injury, disease or death.

### 2. Application as to Cafarella

Cafarella argues that he owed no duty of care to Breitkopf and did not cause or contribute to Breitkopf's death. (Cafarella Motion, at 5–10.) Cafarella contends that his utterance of "gun" after he saw an unidentified armed man on the premises did not create a duty or special relationship between him and Breitkopf, and that Gentile's reaction to Cafarella's utterance was not to immediately shoot but only to turn to his left. (*Id.* at 6–7.) Plaintiff counters that Cafarella assumed a duty of care towards those at the scene because he interjected himself into the management of the crime scene and created the pretense that he was an officer with authority. (Cafarella Opp., at 10–12.) She claims Cafarella either knew or should have known of the danger of misidentifying a plainclothes police officer and the danger of unauthorized civilian interference at a crime scene, and that there is a genuine issue of material fact as to proximate cause because mere seconds elapsed between Cafarella's utterance and Gentile's firing his weapon. (*Id.* at 12–13.)

### a. Duty

In New York, the existence of a duty of care to a plaintiff is a "legal, policy-laden declaration reserved for" judges. *Palka*, 83 N.Y.2d at 585. The injured party must show the defendant owed not merely a general duty to society but a specific duty to the plaintiff, for "without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." *Lauer v. City of New York*, 95 N.Y.2d 95, 100 (2000). Courts traditionally "'fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability.'" *532 Madison Ave. Gourmet Foods v. Finlandia Ctr.*, 96 N.Y.2d 280, 288 (2001) (quoting *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001)).

The scope of an actor's duty to a plaintiff depends on the relationship of the parties, whether the plaintiff was within the zone of foreseeable harm, and whether the harm (the accident) was within the class of reasonably foreseeable hazards that the duty exists to prevent. *Di Ponzio v. Riordan*, 89 N.Y.2d 578, 583 (1997) (citations omitted); *see also Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344–45 (1928) (Cardozo, J.). Although foreseeability generally is for the factfinder to resolve, courts may dismiss cases where the risks are unforeseeable as a matter of law. *Sanchez v. State of New York*, 99 N.Y.2d 247, 252 (2002). "The nature of the inquiry depends, of course, on the particular facts and circumstances in which the duty question arises." *Di Ponzio*, 89 N.Y.2d at 583. Further, to be considered foreseeable, the precise manner in which the harm was inflicted need not be perfectly predicted. *In re September 11 Litig.*, 280 F. Supp. 2d 279, 295 (S.D.N.Y. 2003). According to the New York Court of Appeals:

[W]here an individual breaches a legal duty and thereby causes an occurrence that is within the class of

foreseeable hazards that the duty exists to prevent, the individual may be held liable, even though the harm may have been brought about in an unexpected way. On the other hand, no liability will result when the occurrence is not one that is normally associated with such hazards. Significantly, the kind and number of hazards encompassed within a particular duty depend on the nature of the duty.

*Di Ponzio*, 89 N.Y.2d at 584.

These considerations warrant the conclusion, under the particular circumstances of this case, that Cafarella owed a duty of care to the civilians and law enforcement at the scene, at least commensurate with that required of civilians (and potentially commensurate to the duty reasonably required of police officers in similar circumstances); that Breitkopf was within the zone of foreseeable harm; and that the harm was within the reasonably foreseeable risks. Cafarella consciously chose to remain involved at the scene. Consequently, he undertook a duty to avoid taking action that unreasonably could endanger the safety of those at scene or unreasonably interfere with law enforcement. NCPD officers—including Breitkopf—reasonably expected that they would be able to discharge their duties without improper interference, Cafarella best could govern his conduct, and recognizing a duty on Cafarella's part would not substantially expand or create "new channels of liability." *See Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 167 (1982) ("It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all."). Further, an armed police altercation and shooting is within the class of foreseeable hazards that

could result if plaintiff can prove that Cafarella negligently inserted himself into a police investigation and negligently yelled "gun." Although Breitkopf's and the MTAPD officers' actions influenced the subsequent course of events, Cafarella reasonably should have foreseen that a confrontation or shooting that causes death could arise if he negligently interfered with the police, and/or negligently misidentified a plainclothes officer as having a gun. Therefore, the Court concludes that Cafarella owed a duty of care to Breitkopf and that Breitkopf's death arose from risks within the scope of that duty.

b. Breach and Causation

As set forth below, genuine disputes of material fact preclude summary judgment on the breach and causation elements as to the negligence claim against Cafarella.

Specifically, a rational jury could conclude that Cafarella should have known that Breitkopf had passed by NCPD officers without incident, and, thus, that Breitkopf was a plainclothes officer.[35] On the other hand, if the evidence is construed in Cafarella's favor, a rational jury also could conclude that Cafarella could not have known about Breitkopf beforehand, and

---

[35] Obviously, if plaintiff is able to persuade the jury that it should reasonably infer from the record that Breitkopf was wearing his police identification in a manner that would have been visible to Cafarella, then plaintiff's argument on this claim would be even more compelling. As noted *supra*, defendants point out that no eyewitness saw any police identification around Breitkopf's neck prior to the shooting (and that witnesses only observed it after Breitkopf received medical attention and his shirt was cut open). Even if no police identification was visible, however, a rational jury could still conclude (if the evidence is construed most favorably to plaintiff) that Cafarella should have realized from the surrounding circumstances that Breitkopf likely was an officer.

agree with Cafarella's argument that he did not negligently insert himself into the scene when he saw an armed, plainclothes, unidentified man walking towards an active crime scene. Such a jury, therefore, could find that Cafarella did not breach any duty. Thus, this raises a genuine issue of disputed fact as to whether Cafarella breached his duty of care under the circumstances.

Reasonable minds also could disagree about whether Cafarella proximately caused Breitkopf's death. Proximate or legal cause is defined as that "which in a natural sequence, unbroken by any new cause, produces that event and without which that event would not have occurred." *Rider v. Syracuse Rapid Transit Ry. Co.*, 171 N.Y. 139, 147 (1902). An injury is "proximately caused by an act, or a failure to act, whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury, and that the injury was either a direct result or a reasonably probable consequence of the act or omission." *Jund v. Town of Hempstead*, 941 F.2d 1271, 1286 (2d Cir. 1991). Generally, an intervening intentional or criminal act severs the liability of the original tortfeasor. *Kush v. City of Buffalo*, 59 N.Y.2d 26, 32–33 (1983). However, that "doctrine has no application when the intentional or criminal intervention of a third party or parties is reasonably foreseeable." *Id.* at 33. Construing the evidence most favorably to plaintiff, a reasonable jury could conclude that it was foreseeable to Cafarella that his utterance of "gun" could prompt police officers (such as Gentile) to react with the use of force, including deadly force. Construing the facts most favorably to plaintiff, the Court cannot agree with Cafarella's contention that no reasonable jury could conclude that his utterance thus "played a substantial part in bringing about or actually causing the injury." 941 F.2d at 1286. Thus, the Court concludes that material issues of disputed fact preclude the issue of causation from being resolved on summary judgment in connection with the negligence claim against Cafarella.

Accordingly, the Court denies Cafarella's motion for summary judgment on the negligence/wrongful death claims.

### 3. Application as to the DiGeronimos

As a threshold matter, the Court's holding *supra* that any statutory violation by the DiGeronimos had no practical or reasonable connection with Breitkopf's death also disposes of the negligence claim against the DiGeronimos, because the standard for proximate cause (required for a negligence claim) is more stringent. *See Giuffrida*, 100 N.Y.2d at 81. In any event, the Court analyzes the negligence claim against the DiGeronimos separately below and concludes that the claim cannot survive summary judgment.

#### a. Negligent Entrustment

Under New York law, a claim for negligent entrustment of a dangerous instrumentality is based on the Restatement (Second) of Torts § 390, which provides:

> One who supplies . . . a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself . . . is subject to liability for physical harm resulting to them.

Restatement (Second) of Torts § 390; *see Splawnik v. DiCaprio*, 540 N.Y.S.2d 615, 617 (N.Y. App. Div. 1989). The tort "is based on the degree of knowledge the supplier had or should have had concerning

the entrustee's propensity to use the chattel in an improper or dangerous fashion." *Id.* "If such knowledge can be imputed, the supplier owes a duty to foreseeable parties to withhold the chattel from the entrustee." 540 N.Y.S.2d at 617. Some courts have construed this tort to apply "solely where the defendant had knowledge or reason to know that the user of the item at issue was someone that 'a reasonable person would consider lacking in ordinary prudence.'" *Adeyinka v. Yankee Fiber Control, Inc.*, 564 F. Supp. 2d 265, 287 (S.D.N.Y. 2008) (quoting *McCarthy v. Sturm, Ruger & Co., Inc.*, 916 F. Supp. 366, 370 (S.D.N.Y. 1996)). Further, as the *Splawnik* court recognized, "[m]ost of the case law invoking this doctrine relates to the entrustment of guns or motor vehicles to children, incompetents or intoxicated persons." 540 N.Y.S.2d at 617 (citations omitted).

Defendants' motion primarily addresses proximate cause, but they respond to the merits of the negligent entrustment claim in their reply. Plaintiff argues that a rational jury could conclude that defendants knew of Anthony's "emotional issues" and "[i]t is clear Anthony DiGeronimo was someone a reasonable person would consider lacking in ordinary prudence." (DiGeronimo Opp., at 17.) Defendants counter that plaintiff neither specifies the nature of Anthony's "emotional issues" nor points to evidence supporting a reasonable inference that the DiGeronimos knew Anthony had acted or potentially could act in a manner suggesting that he could use his knives in a dangerous manner or that he otherwise was a risk of harm or danger to others. The Court need not address this issue because, as discussed below, summary judgment is warranted on other grounds, namely: (1) plaintiff cannot establish that any duty the DiGeronimos owed to the officers on their premises extended to protecting officers from a friendly-fire shooting under the circumstances of this case, and (2) no rational jury could conclude that any alleged act or omission by the DiGeronimos was the proximate case of Breitkopf's death.

### b. Duty to Officers on the Premises and Proximate Cause

The DiGeronimos argue that any alleged act or omission by them could not have proximately caused Breitkopf's death, because the incident involving Anthony had ended and Gentile's actions broke the causal chain. (DiGeronimo Motion, at 3.) Plaintiff argues that the DiGeronimos had a duty to protect the officers on their premises from foreseeable harm. Specifically, she claims the DiGeronimos "failed to protect the police officers initially responding to the scene from harm from their son," that Officer Breitkopf was killed because of this breach, and that "[i]t was foreseeable that a police officer involved in or responding to an altercation with defendants' son would be killed in a 'friendly fire' exchange." (DiGeronimo Opp., at 18–19.)

Plaintiff's conception of the scope of the duty is overbroad. "[L]andowners have a duty to protect tenants, patrons or invitees from foreseeable harm caused by the criminal conduct of others while they are on the premises." *Hamilton*, 96 N.Y.2d at 233 (citing *Nallan v. Hemsley-Spear, Inc.*, 50 N.Y.2d 507, 518–19 (1980)). However, "New York courts have been cautious in extending liability to defendants for their failure to control the conduct of others, 'even where as a practical matter [the] defendant can exercise such control.'" *September 11 Litig.*, 280 F. Supp. 2d at 290 (quoting *D'Amico v. Christie*, 71 N.Y.2d 76, 88 (1987)). "[C]ourts have imposed a duty when the defendant has control over the third party tortfeasor's actions"—which undisputedly is not the case here—"or the relationship between the defendant and

plaintiff requires the defendant to protect the plaintiff from the conduct of others." *Id.* According to the New York Court of Appeals, "[t]he key in each [situation] is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Hamilton*, 96 N.Y.2d at 233. Under the circumstances of this case, it is clear the DiGeronimos' duty cannot and did not encompass a duty to protect officers and others at the scene from any conduct by third parties—such as another police officer—that occurs on the premises, particularly where the DiGeronimos could exert no control over the police officers or their procedures. *See Waters v. N.Y.C. Hous. Auth.*, 69 N.Y.2d 225, 228–31 (1987) (holding that owner of housing project who failed to keep building's door locks in good repair did not owe duty to passerby to protect her from being dragged off the street into the building and assaulted, because imposing such duty would do little to minimize crime, and the social benefits to be gained did "not warrant the extension of the landowner's duty to maintain secure premises to the millions of individuals who use the sidewalks of New York City each day and are thereby exposed to the dangers of street crime."). Again, the DiGeronimos had no right or responsibility to oversee the police operation on their premises, and thus had no duty to protect Breitkopf (or any other officer) from a friendly-fire incident.

In addition, although plaintiff argues that "[i]t was foreseeable that a police officer involved in or responding to an altercation with defendants' son would be killed in a 'friendly fire' exchange" (DiGeronimo Opp., at 19), a rational jury would certainly have to conclude that the events involving the officers after Anthony's death were intervening acts that preclude a finding that any negligent acts by the DiGeronimos were

the proximate cause of Breitkopf's death. Proximate cause is lacking when an intervening act "is of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant." *Kush*, 59 N.Y.2d at 33. Thus, "when such an intervening cause 'interrupts the natural sequence of events, turns aside their course, prevents the natural and probable result of the original act or omission, and produces a different result that could not have been reasonably anticipated,' it will prevent a recovery on account of the act or omission of the original wrongdoer." *Sheehan v. City of New York*, 40 N.Y.2d 496, 503 (1976) (citations omitted). Here, plaintiff's conclusory assertion and the temporal proximity of the events do not create a genuine dispute as to causation. It is uncontroverted that the "normal course of events" had run and, consequently, the only reasonable inference is that the intervening act was "extraordinary under the circumstances": Anthony had been shot, the "slow down" order issued, and the DiGeronimos had no control over Breitkopf, Cafarella, Gentile, or Ramos—the latter three being persons plaintiff argues should not have been involved in the first place. *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980). "[B]road liability . . . should not be imposed without a more tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs' injuries, and that defendants were realistically in a position *to prevent the wrongs*." *Hamilton*, 96 N.Y.2d at 234 (emphasis added). Thus, even construing the evidence most favorably to plaintiff, a rational jury could not find "that the gun used to harm [Breitkopf] came from a source amenable to the exercise of any duty of care that plaintiff" would impose upon the DiGeronimos. *Id.* Gentile's shooting of

Breitkopf may have "operat[ed] upon but [did] not flow from the original negligence." *Derdiarian*, 51 N.Y.2d at 315. Plaintiff has failed to create a genuine issue of material fact on the issue of causation as it relates to the alleged negligence of the DiGeronimos.

Accordingly, the Court grants the DiGeronimos' motion for summary judgment on the negligence claim.

## IV. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the motions for summary judgment with respect to Gentile, the MTA, and Cafarella, and grants the motions for summary judgment in their entirety with respect to Ramos, the City, and the DiGeronimos. The surviving claims are the excessive force, battery, and wrongful death claims against Gentile; the related vicarious liability claim against the MTA; and the negligence, wrongful death, and GML § 205-e claims against Cafarella (based upon Penal Law Section 190.25).

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 29, 2014
Central Islip, NY

\* \* \*

Plaintiff is represented by John Zervopolous and Joseph S. Bavaro of Salenger Sack Kimmel & Bavaro, LLP, 180 Froehlich Farm Blvd., Woodbury, NY 11797; Eugene B. Nathanson, 30 Vesey St., 2d Floor, New York, NY 10007; and Michael A. Baranowicz of Montfort, Healy, McGuire & Salley, 840 Franklin Ave., Garden City, NY 11530. Gentile is represented by George J. Carpenter of Rafter and Associates, 29 Broadway, 14th Floor, New York, NY 10006. Ramos and the MTA are represented by Steve S. Efron and Renee Lucille Cyr of the Law Office of Steve S. Efron, 60 East 42nd St., Suite 2020, New York, NY 10165. Through summary judgment, Cafarella was represented by Sandra Bonder and Beth Shapiro of Shapiro, Beilly, Rosenberg, Aronowitz, Levy & Fox, LLP, 225 Broadway, 13th Floor, New York, NY 10007. Cafarella currently is represented by Joseph M. Puzo of Zaklukiewicz, Puzo & Morrissey, LLP, 2701 Sunrise Highway, Suite 2, Islip Terrance, NY 11752. The Estate is represented by Jeffrey M. Pincus of Lewis, Johs, Avallone, Aviles & Kaufman, LLP, 425 Broadhollow Rd., Suite 400, Melville, NY 11747, and by Daniel A. Bartoldus of Lewis, Johs, Avallone, Aviles & Kaufman, LLP, One CA Plaza, Suite 225, Islandia, NY 11749. The DiGeronimos are represented by Joseph H. Perrone of Ryan, Perrone & Hartlein, P.C., 200 Old Country Rd., Suite 300, Mineola, NY 11501. The City is represented by Elizabeth N. Krasnow of the New York City Law Department, 100 Church St., New York, NY 10007.